MARC J. WINTHROP – State Bar No. 63218
CHARLES LIU – State Bar No. 190513
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Ste 400
Newport Beach, CA 92660

Telephone: (949) 720-4100
Facsimile: (949) 720-4111

Proposed General Insolvency Counsel for
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 08-09859-LA11 |
| PHAGE BIOTECHNOLOGY CORPORATION, | Chapter 11 Proceeding |
| | **DEBTOR'S <u>EMERGENCY</u> MOTION FOR ORDER APPROVING DEBTOR-IN-POSSESSION LOAN; DECLARATIONS IN SUPPORT THEREOF** |
| Debtor and Debtor-in-Possession | DATE: November __, 2008<br>TIME: _____ __.m.<br>CTRM: Department 2, Room 118<br>325 West F Street<br>San Diego, CA 92101 |

1        Phage Biotechnology Corporation, a Delaware corporation, the debtor and debtor-in-

2  possession in the above entitled Chapter 11 proceeding (the "Debtor"), hereby moves the Court, <u>on</u>

3  <u>an emergency basis</u>, for an order granting the following relief:

4        A)     Authorizing the Debtor to enter into that certain Loan Agreement, Secured

5                Convertible Promissory Note, Security Agreement, and Lenders Rights

6                Agreement (the "DIP Loan") attached in substantially final form to the

7                accompanying Declaration of Thomas Stegmann (the "Stegmann

8                Declaration") as Exhibit "A;"

9        B)     Authorizing the Debtor to grant the Lender, as defined in the DIP Loan

10              (the "DIP Lender"), a first priority lien on all of the Debtor's assets to

11              secure the obligations in, or incurred under the DIP Loan.

12        C)     Authorizing the use of the DIP Loan in accordance with the budget attached

13              to the Stegmann Declaration as Exhibit "B" (the "Budget") until a final

14              hearing is set on this Motion;

15        D)     Authorizing the Debtor to exceed any line item in the Budget by up to

16              twenty percent (20%) in any one month, as long as the overage for all items

17              in the aggregate does not exceed fifteen percent (15%) of the total budget

18              amount for that month, and providing that any unused funds in one period

19              may be carried over and used in a later budget period;

20        E)     Setting a final hearing on this Motion in accordance with the requirements

21              of Rule 4001 of the Federal Rules of Bankruptcy Procedure; and

22        F)     Granting such further relief as the Court deems just and proper.

1        This motion is made on the basis of the Stegmann Declaration, the Declaration of Loren

2    King, the Declaration of Charles Liu, the within the points and authorities, and on such other

3    evidence as the Court elects to consider prior to or at the hearing on this matter.

4

5    DATED:  November 4, 2008                **WINTHROP COUCHOT**
                                             **PROFESSIONAL CORPORATION**

6

7                            By:  _____

8                                    Marc J. Winthrop
                                             Charles Liu

9                            Proposed General Insolvency Counsel for
                                             Debtor and Debtor-in-Possession

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I

## **PRELIMINARY STATEMENT**

Phage Biotechnology Corporation, the debtor and debtor-in-possession herein ("Phage" or "Debtor") is in the business of developing and commercializing an efficient method of manufacturing bio-pharmaceuticals with its proprietary technology.  On October 2, 2008, certain creditors commenced an involuntary Chapter 7 case against the Debtor (the "Petition Date").  On October 28, 2008, the Debtor converted the case into a voluntary Chapter 11 case.

By this Motion, Debtor seeks authority to enter into that certain Loan Agreement, Secured Convertible Promissory Note, Security Agreement, and Lenders Rights Agreement (the "DIP Loan") attached in substantially final form to the accompanying Declaration of Thomas Stegmann (the "Stegmann Declaration") as Exhibit "A."  To preserve the value of its business, the Debtor needs the financing provided for in the DIP Loan from the "Lenders," as defined in the DIP Loan (the "DIP Facility").   The relief sought in this motion will provide the Debtor immediate access to these critical funds.

As far as the Debtor is aware, there are no secured creditors in this case, including any creditors who claim a security interest in the Debtor's cash.  Therefore, the Debtor is not moving for use of cash collateral.

# II

## **GENERAL BACKGROUND FACTS REGARDING THE DEBTOR**

### A)    **The Debtor**.

The Debtor is a Delaware corporation with its corporate office currently located in Las Vegas, Nevada and with its research and manufacturing facilities located in San Diego, California. The Debtor generates manufacturing and R&D revenue for work performed at the request of a related company, CardioVascular Biotherapeutics ("Cardio"). The revenue generated from this sole customer is not enough to produce a cash profit. The Debtor currently employs 11 people, including part time employees and consultants of various kinds.   From the Debtor's inception until October 7, 2008, the Debtor's Chairman, President, and CEO was Daniel Montano ("Montano").  Mr.

Montano resigned from all positions with the Debtor on or about October 7, 2008. The Debtor's current CEO is Thomas Stegmann and the Debtor's current CFO is Loren Stegmann.

The Debtor's executive office is currently located in Las Vegas, Nevada, pursuant to a lease expiring in 2011. The Debtor is considering moving its executive office to San Diego, California. The Debtor's R&D facility in San Diego, California consists of approximately 10,000 square feet of industrial space, pursuant to a lease expiring in 2013. The Debtor's manufacturing facility in San Diego, California consists of approximately 7,000 square feet of industrial space, pursuant to a lease expiring in 2013.

**B)     The Debtor's Business.**

The Debtor was founded in 1998 to commercialize an efficient method of manufacturing bio-pharmaceuticals which was invented by a group of Ukrainian scientists. As a development stage company which is still not generating significant revenue, the Debtor depends significantly on external funding for survival and progress. A majority of the external funding provided to date has come from the holders (the "Noteholders") of the Debtor's promissory notes (the "Notes"). The Debtor's promissory notes were issued at various dates from 2001 through to 2004 with a three year maturity date. The Debtor raised a total of $16.7 million in the period from 2001 to 2005 from two series of convertible promissory notes. Series I totaled $11.6 million principal with 233 Noteholders and Series II totaled $5.1 million of principal with 20 Noteholders. The principal and accrued interest of these Notes now total approximately $23.5 million, or approximately 75% of the Debtor's total debt. The corporate books of record of the Debtor are unaudited.

The Debtor has a contractual relationship with Phage Biotech Ukraine LLC, located in Kiev, Ukraine ("Phage Ukraine"), which employs a research team and supports the San Diego manufacturing facility. Substantially all of the Debtor's original intellectual property was sourced from Phage Ukraine.

The Debtor's intellectual property includes five U.S. patents and related foreign patent approvals in European countries with large markets for the Debtor's drugs. In Japan, three of the Debtor's U.S. Patents are currently being examined.

1    The Debtor's main route to commercialization and profitability is to seek further revenue

2   generating activities for its licensed San Diego manufacturing facility, and to gain U.S. Food and

3   Drug Administration ("FDA") approval for its bio-generic and proprietary drug portfolio to be

4   manufactured by the Phage process.  At present two compounds are in FDA clinical trials: Phage's

5   Human Growth Hormone ("HGH") and Cardio's Fibroblast Growth Factor ("FGF").

6           **C)      Events Precipitating This Chapter 11 Filing.**

7           The Debtor's financial problems and the consequent need to file this bankruptcy proceeding

8   were primarily caused by the following problems:

9           As a start up company, the Debtor has minimal income and thus needs infusions of outside

10   capital in order to fund its operations of developing and commercializing its intellectual property.

11   From 1998 to 2008, the Debtor raised net capital proceeds of $24.5 million in common and

12   preferred stock, and note and loan financing.  However, from late summer 2005 until summer of

13   2008, the Debtor only raised net proceeds of $6.0 million of outside capital which was grossly

14   inadequate in relation to the Debtor's needs, maturing Note obligations, and the scale of its

15   opportunity.  This failure to raise sufficient capital in the last several years led to the Debtor

16   defaulting on its Note obligations as well as obligations to other creditors.

17           **E)      The Involuntary Bankruptcy Filing and Conversion to Chapter 11.**

18           Because of the Debtor's default under the Notes as well as the Debtor's default of its

19   obligations to one of its board members, on October 2, 2008 the following creditors of the Debtor

20   filed an involuntary Chapter 7 petition against the Debtor: Sergiy Buryak; International Legal

21   Consultants; Clifton Melvin; Simon Kornberg; Jon Kornberg; Forest Nominees Ltd.; Shellac

22   Limited; Alex Catto; Iain Little; Colin Abraham; Pang Yen Chen; Colin MacNab; Robert &

23   Katrina Chanson; Lalique Holdings; Fabio Pelli; Russel Earl Wayne Lotherington; Jonathan

24   Bonsey; Paul Murray; and Lindsey Fuller (collectively, "Petitioning Creditors").

25           Concurrently with the involuntary petition on October 2, 2008, the Petitioning Creditors

26   filed a motion for the appointment of an interim trustee.   On October 7, 2008, Mr. Montano

27   resigned and the Debtor appointed one of its board members, Mr. Stegmann, to be the Debtor's

28   new CEO.  Because the Petitioning Creditors have great confidence in Mr. Stegmann, the

Petitioning Creditors withdrew the motion for appointment of an interim trustee.  The Debtor also appointed two of the Petitioning Creditors, Richard Ritter and Robert Chanson, to the Debtor's board.  The Debtor's new board decided it is in the Debtor's best interest to reorganize in a Chapter 11 case so the Debtor converted its involuntary Chapter 7 case to a voluntary Chapter 11 case.

**F)** **The General Outline of Turnaround Plan**.  The Debtor's turnaround effort, which is now substantially underway, will focus first on obtaining emergency capital to pay the Debtor's operating expenses and protect its property.  Thus stabilized, the Debtor will pursue long term capital to develop and commercialize its intellectual property.

**G)** **Assets and Liabilities.**   The table below summarizes the value of the Debtor's assets that serve as collateral for the secured claims affected by this Motion:

**ASSETS**

| | | |
|---|---:|---|
| Current assets | | |
| Cash and cash equivalents | $      3,500 | |
| Accounts Receivable | 150,000 | a) |
| Total current assets | 153,500 | |
| Property and equipment, net | 430,000 | |
| Due from affiliate | 185,000 | b) |
| Other assets | 165,000 | c) |
| Total assets | $    933,500 | |

a)    Due from Cardio, a related party. Amount will change when the actual billings are determined.
b)    Due from GHL from 2007 Series B preferred shares issued.
c)    Security deposit, two leases, and utility deposit

The above values are taken from the Debtor's September 30, 2008 balance sheet (unaudited).  They reflect accounting values (depreciated cost, etc.) not market values.  The Debtor believes that the market value of the Debtor's assets is less than the values indicated above.

The Debtor does not believe there are any secured creditors in this case. Debtor's counsel performed a LEXIS search to confirm this.  No secured claims undisclosed by this search.  Of the Debtor's total unsecured debt, approximately $23.5 million, or 75%, is represented by Noteholder claims.

**H)**    **The DIP Facility**. The terms of the DIP Facility are summarized below:

| The DIP Facility | |
|---|---|
| **Line Amount** | One million five hundred thousand dollars ($1,500,000) |
| **Advances** | $200,000 upon Court approval of the DIP Facility (the "Initial Disbursement"); $300,000 within six weeks after the Initial Disbursement; and commencing March 1, 2009, up to $1,000,000 in $250,000 increments upon the Debtor's request. |
| **Interest Rate** | Interest will accrue at the annual rate of 10%. |
| **Term** | The Term Loan matures on the earlier of 12 months after the Initial Disbursement, upon occurrence of a Major Funding Event, or upon the occurrence of an Event of Default as those terms are defined in the DIP Facility. |
| **Security** | All amounts owing under the DIP Facility will be secured by a first priority perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Debtor, whether now owned or hereafter acquired, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof. |

The foregoing is a summary of the material terms of the DIP Facility. In the event of a discrepancy between the summary of the terms described herein and the terms of the DIP Facility, the terms of the DIP Facility documents control. Accordingly all creditors and parties-in-interest are urged to read the DIP Facility, in substantially final form, attached to the Stegmann Declaration as Exhibit "A" in their entirety.

### III

### RELIEF IS JUSTIFIED ON AN EMERGENCY BASIS

In section 363(c)(3), Congress recognized that preliminary hearings on cash collateral would frequently be held on an emergency basis by stating therein that such hearing "shall be scheduled in accordance wit the needs of the debtor". 11 U.S.C. § 363(c)(3). The courts have also recognized that emergency relief on the use of cash collateral is necessary after a case is filed. In re Center Wholesale, Inc., 759 F. 2d 1440, 1444 (9th Cir. 1985) ("We realize that 'in certain circumstances the entire reorganization effort may be thwarted if emergency relief is withheld' and that reorganization under the Bankruptcy Code 'is a perilous process, seldom more so than at the outset of the proceedings when the debtor is often without sufficient cash flow to fund essential business operations.' … It is for this very reason that Congress specified that hearings concerning

1    business operations.' ... It is for this very reason that Congress specified that hearings concerning

2    the use of cash collateral 'shall be scheduled in accordance with the needs of the debtor.' "); In re

3    Sullivan Ford Sales, 2 B.R. 350, 355 (Bankr.D.Me.1980).

4        As indicated above, the Debtor is an operating company that is developing and

5    commercializing an efficient method of manufacturing bio-pharmaceuticals with its proprietary

6    technology.  To successfully operate post-petition and preserve the value of this business enterprise

7    at this critical juncture, the Debtor needs immediate relief from this Court.

8        <u>As indicated in the attached Declaration of Loren King, all of the items set forth in the</u>

9    <u>Budget in the columns labeled "10/31/2008" and "11/7/2008" are necessary to avoid immediate</u>

10    <u>and irreparable harm to the Debtor with the possible exception of the following:</u>

11    •  The Consultant item in the 11/7/2008 column in the amount of $32,000 may be deferred

12        briefly without immediate and irreparable harm to the Debtor because it represents the

13        payroll of the Debtor's CEO, CFO, General Counsel, and IT manager whose employment is

14        pending approval.

15    •  Travel expense in the amount of $2,500 in the 10/31/2008 column and $1,500 in the

16        11/7/2008 column may be deferred briefly without immediate and irreparable harm to the

17        Debtor.

18    •  Legal expense in the amount of $25,000 in the 11/7/2008 column may be deferred briefly

19        without immediate and irreparable harm to the Debtor because the employment of Debtor's

20        counsel is pending approval.

21    •  Rent for the R&D lab in the amount of $10,000 in the 11/7/2008 column may be deferred

22        briefly without immediate and irreparable harm to the Debtor because the Debtor intends to

23        move out of this facility forthwith and reject the lease.

24        The Utilities item in the 11/7/2008 column in the amount of $8,000 is the electric bill.  The

25    Misc item in the amount of $2,500 in the 10/31/2008 column and $2,500 in the 11/7/2008 column

26    represent other utilities and administrative support expenses other than the electric bill.  Both of

27    these are necessary to avoid immediate and irreparable harm to the Debtor   because they are

28    needed to keep the Debtor's doors open.

1    The Mfg Supplies item in the amount of $5,000 in the 10/31/2008 column and $10,000 in

2    the 11/7/2008 column represent fees to hire an outside vendor or revalidate the Debtor's

3    equipment.  These fees are necessary to avoid immediate and irreparable harm to the Debtor

4    because the Debtor's State of California licensed facility has been dormant for some time and

5    needs revalidation in order to resume operations.

6    The Intellectual Property item in the 11/7/2008 column in the amount of $6,000 represent

7    current patent fees.  These fees are necessary to avoid immediate and irreparable harm to the

8    Debtor because the Debtor's patents will be at risk if the fees are not paid.

9    The Move Costs Lab and Storage Costs items in the 11/7/2008 column in the amount of

10    $7,500 and $750 respectively are the costs of moving out of the Debtor's R&D facility.  These

11    items are necessary to avoid immediate and irreparable harm to the Debtor because moving out

12    quickly will preserve and protect the Debtor's intellectual property and minimize the Debtor's rent

13    liability.

14    Without the immediate ability to pay these costs and expenses, the Debtor cannot continue

15    its business operations.  On these facts and circumstances good cause exists for emergency relief.

16    In order to continue operations the Debtor needs immediate relief from this Court.  On these facts

17    and circumstances good cause exists for an expedited hearing.

18    **V**

19    **COURT APPROVAL OF THE DIP LOAN**

20    **IS WARRANTED UNDER SECTION 364(c)**

21    Section 364(c) of the Bankruptcy Code sets forth the criteria that must be satisfied to

22    obtain a post-petition loan having priority over all other administrative claims:

23    (c) If the trustee is unable to obtain unsecured credit allowable under section

24    503(b)(1) of this title as an administrative expense, the court, after notice and a
hearing, may authorize the obtaining of credit or the incurring of debt -

25    . . . . .

26    (1) with priority over any or all other administrative expenses of the kind
specified in section 503(b) or 507(b) of this title.

27    11 U.S.C. §364(c)(1).

28

**A.    The Debtor Has been unable to obtain financing by any other means.**

As stated above and set forth in the Stegmann Declaration, the Debtor must immediately obtain financing in order to provide needed liquidity, and equally important to secure the support of its customers and vendors.  Despite the Debtor's diligent efforts to obtain financing from other sources prepetition, it has been unable to obtain credit on any more favorable basis than what is set forth in the DIP Loan.  Accordingly, the terms presented to the court are the best available in the market place at this point in time, for this type of loan, given the Debtor's substantially overleveraged balance sheet, and its history of losses.

On the basis of the evidence submitted herewith, the Debtor has met the first prong of its burden under Section 364(d), to wit, that it cannot find financing on more favorable terms.  See, In re Aqua Associates, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by the credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere."); In re Ames Dept. Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("A court, however, may not approve any credit transaction . . . unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under Sections 364(a) or (b). . . The cases clearly establish that although a debtor is not required to seek credit from every possible source, a debtor must show that it has made reasonable effort to seek other sources of credit available under section 364(a) and (b)."); In re Snowshoe Co., Inc., 789 F. 2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.  This is particularly true when, as the court determined here, time is of the essence..."); In re Reading Tube Industries, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (Chapter 11 debtor seeking Bankruptcy Court approval of post-petition financing agreement which would grant lender superpriority must demonstrate under 11 U.S.C. §364(d) unsuccessful good faith effort to obtain less onerous financing by proving debtor attempted to contact at least several available lending institutions).

**B.    The Debtor has good business reasons justifying the proposed loan.**

To obtain relief under Section 364(c) a debtor must provide evidence that there is a good business reason justifying the proposed financing, and that the debtor cannot secure the same financing terms on an administrative priority basis.  As more fully explained in the Stegmann Declaration, the Debtor is seeking the financing to provide liquidity for post-petition operations and even more importantly to ensure the continued support of its employees and vendors providing critically needed goods and services.  On the facts of this case, the Debtor is entitled to relief under Section 364(c)(1). See,  In re Snowshoe Co., Inc., 789 F. 2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.  This is particularly true when, as the court determined here, time is of the essence...").

**C.    The DIP Loan Does Not Contain Provisions Proscribed by the Local Rules.**

As indicated in the attached Declaration of Charles Liu, the DIP Loan does not contain any of the following:

1. Provisions that grant cross-collateralization protection (other than replacement liens) to the prepetition secured creditor (i.e.; clauses that secure prepetition debt by post-petition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law).

2. Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditors without first giving parties in interest at least seventyfive (75) days from the entry of the interim order and the official committee of unsecured creditors, if formed, no less than sixty (60) days notice from the later of the date of its formation or the date of its retention of counsel to investigate such matters, unless otherwise directed by the court.

3. Provisions that seek to waive rights under 11 U.S.C. § 506(c).

4. Provisions that grant immediately to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, and 549.

5. Provisions that "roll over" prepetition debt of the prepetition secured creditor to postpetition debt.

6. Provisions which provide carveouts for administrative expenses that do not treat all professionals equally or on a pro rata basis.

7. Provisions in any agreement for use of cash collateral, financing or conditioning the automatic stay that in effect operate to divest the debtor-in-possession of any discretion in the formulation of a plan or administration of the estate or limit access to the court to seek any relief under other applicable provisions of law. Such provisions include, without limitation, agreements with respect to the treatment of claims.

## VI

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtor respectfully requests that the Court grant the relief prayed for herein.

DATED:  November 4, 2008

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**

By: _____
        Marc J. Winthrop
        Charles Liu
Proposed General Insolvency Counsel for
Debtor and Debtor-in-Possession

## DECLARATION OF THOMAS STEGMANN

I, Thomas Stegmann, hereby declare to the best of my knowledge and belief as follows:

1.       I am the Chief Executive Officer of Phage Biotechnology Corporation, the debtor and debtor-in-possession herein ("Phage" or "Debtor").  The facts stated herein are within my personal knowledge or information, whether acquired directly, or through my familiarity with the Debtor.  The opinions expressed herein represent the opinions of the Debtor entity, of which I am an authorized agent, unless otherwise indicated.

2.       Attached hereto as Exhibit "A" is a copy of that certain Loan Agreement, Secured Convertible Promissory Note, Security Agreement, and Lenders Rights Agreement (the "DIP Facility") in substantially final form.

3.       Attached hereto as Exhibit "B" is a copy of the Budget for the use of the proceeds of the DIP Loan.

4.       The Debtor is a Delaware corporation founded in 1998 with its corporate office currently located in Las Vegas, Nevada and with its research and manufacturing facilities located in San Diego, California.  The Debtor generates manufacturing and R&D revenue for work performed at the request of a related company, CardioVascular Biotherapeutics ("Cardio"). The revenue generated from this sole customer is not enough to produce a cash profit, and pay Note Obligations and other debts.  The Debtor currently employs 11 people, including part time employees and consultants of various kinds.   From the Debtor's inception until October 7, 2008, the Debtor's Chairman, President, and CEO was Daniel Montano ("Montano").

5.       The Debtor's executive office is currently located in Las Vegas, Nevada, pursuant to a lease expiring in 2011.  The Debtor is considering moving its executive office to San Diego, California.  The Debtor's R&D facility in San Diego, California consists of approximately 10,000 square feet of industrial space, pursuant to a lease expiring in 2013.  The Debtor's manufacturing facility in San Diego, California consists of approximately 7,000 square feet of industrial space, pursuant to a lease expiring in 2013.

6.       As a development stage company which does not generate significant revenue, the Debtor depends significantly on external funding for survival and progress. A majority of the

external funding provided to date has come from the holders (the "Noteholders") of the Debtor's promissory notes (the "Notes"). The Debtor's promissory notes were issued at various dates from 2001 through 2004 with a three year maturity date. The Debtor raised a total of $16.7 million in the period from 2001 through 2004 from two series of convertible promissory notes. Series I totaled $11.6 million principal with 233 Noteholders and Series II totaled $5.1 million of principal with 20 Noteholders. The principal and accrued interest of these Notes now totals approximately $23.5 million. From late summer 2005 until summer of 2008, the Debtor raised net proceeds of $3.0 million through sales of Series B Preferred Shares, and an additional $3.0 million of outside capital in the form of loans to the Debtor. This capital totaling $6.0 million was grossly inadequate in relation to the Debtor's current Note Obligations due of $23.5 million, other loans and trade debt, its current operating needs, and the scale of its opportunity. This failure to raise sufficient capital has led to the Debtor defaulting on its Note obligations as well as obligations to other creditors. As far as the Debtor is aware, there are no secured creditors in this case.

7.     The Debtor's intellectual property includes five U.S. patents and related foreign patent approvals in European countries with large markets for the Debtor's drugs. In Japan, three of the Debtor's U.S. Patents are currently being examined.

8.     The Debtor's main route to commercialization and profitability is to seek further revenue generating activities for its licensed San Diego manufacturing facility, and to gain U.S. Food and Drug Administration ("FDA") approval for its bio-generic and proprietary drug portfolio to be manufactured by the Phage process. At present two compounds are in FDA clinical trials: Phage's Human Growth Hormone ("HGH") and Cardio's Fibroblast Growth Factor ("FGF").

9.     On October 2, 2008 certain creditors of the Debtor filed an involuntary Chapter 7 petition against the Debtor (the "Petitioning Creditors").

10.     On October 7, 2008, Mr. Montano resigned and the Debtor appointed one of its board members, Mr. Stegmann, to be the Debtor's new CEO. The Debtor also appointed two of the Petitioning Creditors, Richard Ritter and Robert Chanson, to the Debtor's board. The Debtor's new board decided it is in the Debtor's best interest to reorganize in a Chapter 11 case so the Debtor converted its involuntary Chapter 7 case to a voluntary Chapter 11 case.

11.     The Debtor's turnaround effort, which is now underway, will focus first on obtaining emergency capital to pay the Debtor's operating expenses and protect its property. Thus stabilized, the Debtor will pursue long term capital to develop and commercialize its intellectual property.

12.     The Debtor is seeking the financing to provide liquidity for post-petition operations and even more importantly to ensure the continued support of its employees and vendors providing critically needed goods and services.

13.     The Debtor's immediate cash obligations include, but are not limited to the following: employee wages, raw material purchases, and general administrative and overhead costs. Without the immediate ability to pay these costs and expenses, the Debtor cannot continue its business operations.

14.     Despite the Debtor's diligent efforts to obtain financing from other sources prepetition, it has been unable to obtain credit. Accordingly, the terms presented to the court are believed to be the best available option for the Debtor at this point in time, for this type of emergency capital loan, given the Debtor's substantially overleveraged balance sheet, and its history of losses.

I declare that the foregoing is true and correct under the penalty of perjury.

Executed this 31th day of October 2008, in San Diego, California.

Thomas Stegmann, CEO
Phage Biotechnology Corporation

## DECLARATION OF LOREN KING

I, Loren King, hereby declare and state as follows:

1.      Effective October 14th, 2008, I was appointed as the Chief Financial Officer of Phage Biotechnology Corporation, the debtor and debtor-in-possession herein ("Phage" or "Debtor"). The statements made herein have been acquired through my personal knowledge or information, whether acquired directly, or through my familiarity with the Debtor's books and records, which are unaudited. This declaration is in support of the Debtor's Emergency Motion (the "Motion") for Use of Debtor-in-Possession Loan (the "DIP Loan").

2.      Attached hereto as Exhibit "1" is a copy of the cash flow budget for use of the proceeds of the DIP Loan (the "Budget"). Exhibit "1" attached hereto is the same document as Exhibit "B" to the Motion.

3.      All of the items set forth in the Budget in the columns labeled "10/31/2008" and "11/7/2008" are necessary to avoid immediate and irreparable harm to the Debtor except for the following:

- The Consultant item in the 11/7/2008 column in the amount of $32,000 may be deferred briefly without immediate and irreparable harm to the Debtor because it represents the payroll of the Debtor's CEO, CFO, General Counsel, and IT manager whose employment is pending approval.

- Travel expense in the amount of $2,500 in the 10/31/2008 column and $1,500 in the 11/7/2008 column may be deferred briefly without immediate and irreparable harm to the Debtor.

- Legal expense in the amount of $25,000 in the 11/7/2008 column may be deferred briefly without immediate and irreparable harm to the Debtor because the employment of Debtor's counsel is pending approval.

- Rent for the R&D lab in the amount of $10,000 in the 11/7/2008 column may be deferred briefly without immediate and irreparable harm to the Debtor because the Debtor intends to move out of this facility forthwith.

1    4.    The Utilities item in the 11/7/2008 column in the amount of $8,000 is the electric

2    bill. The Misc item in the amount of $2,500 in the 10/31/2008 column and $2,500 in the

3    11/7/2008 column represent other utilities and administrative support expenses other than the

4    electric bill. Both of these are necessary to avoid immediate and irreparable harm to the Debtor

5    because they are needed to keep the Debtor's doors open.

6    5.    The Mfg Supplies item in the amount of $5,000 in the 10/31/2008 column and

7    $10,000 in the 11/7/2008 column represent fees to hire an outside vendor or revalidate the Debtor's

8    equipment. These fees are necessary to avoid immediate and irreparable harm to the Debtor

9    because the Debtor's State of California licensed facility has been dormant for some time and

10    needs revalidation in order to resume operations.

11    6.    The Intellectual Property item in the 11/7/2008 column in the amount of $6,000

12    represent current patent fees. These fees are necessary to avoid immediate and irreparable harm to

13    the Debtor because the Debtor's patents will be at risk if the fees are not paid.

14    7.    The Move Costs Lab and Storage Costs items in the 11/7/2008 column in the

15    amount of $7,500 and $750 respectively are the costs of moving out of the Debtor's R&D facility.

16    These items are necessary to avoid immediate and irreparable harm to the Debtor because moving

17    out quickly will preserve and protect the Debtor's intellectual property and minimize the Debtor's

18    rent liability.

19    I declare that the foregoing is true and correct under the penalty of perjury.

20    Executed this 3rd day of November 2008, in Las Vegas, Nevada.

21

22    _____
       Loren King

23

24

25

26

27

28

## DECLARATION OF CHARLES LIU

I, Charles Liu, hereby declare and state as follows:

1.      I am an attorney with Winthrop Couchot Professional Corporation, the proposed general insolvency counsel to Phage Biotechnology Corporation, the debtor and debtor-in-possession herein ("Phage" or "Debtor"). The statements made herein have been acquired through my personal knowledge or information. This declaration is in support of the Debtor's Emergency Motion (the "Motion") for Use of Debtor-in-Possession Loan (the "DIP Loan").

2.      The DIP Loan, attached to the Stegmann Declaration as Exhibit "A," does not contain any of the following:

Provisions that grant cross-collateralization protection (other than replacement liens) to the prepetition secured creditor (i.e.; clauses that secure prepetition debt by post-petition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law).

Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditors without first giving parties in interest at least seventyfive (75) days from the entry of the interim order and the official committee of unsecured creditors, if formed, no less than sixty (60) days notice from the later of the date of its formation or the date of its retention of counsel to investigate such matters, unless otherwise directed by the court.

Provisions that seek to waive rights under 11 U.S.C. § 506(c).

Provisions that grant immediately to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, and 549.

Provisions that "roll over" prepetition debt of the prepetition secured creditor to postpetition debt.

Provisions which provide carveouts for administrative expenses that do not treat all professionals equally or on a pro rata basis.

Provisions in any agreement for use of cash collateral, financing or conditioning the automatic stay that in effect operate to divest the debtor-in-possession of any discretion in the

1  formulation of a plan or administration of the estate or limit access to the court to seek any relief

2  under other applicable provisions of law. Such provisions include, without limitation, agreements

3  with respect to the treatment of claims.

4       I declare that the foregoing is true and correct under the penalty of perjury.

5       Executed this 4 day of November 2008, in Newport Beach, California.

7  Charles Liu

# EXHIBIT "A"

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") is entered into as of _____, 2008 (the "Effective Date"), by and between PHAGE BIOTECHNOLOGY CORPORATION, a Delaware corporation ("the Company"), and the persons executing this Agreement as lenders (collectively, the "Lenders" and individually a "Lender").

## ARTICLE I

## RECITALS

1.1     The Company is the debtor in Case Number 08-09859-LA7, United States Bankruptcy Court, Southern District of California (the "Court"). The Company has received approval of the Court to allow Lenders to provide emergency, short-term funding to the Company to allow the Company to maintain its operations while seeking to attain additional financing.

1.2 The Company and Lenders, some of whom will be identified following the initial execution of this Agreement by International Legal Consultants ("ILC") (which is providing the Initial Disbursement defined below), will be executing the following agreements, which together with this Agreement, shall collectively be referred to as the "Loan Documents": (i) Secured Convertible Promissory Notes in the aggregate amount of up to One Million Five Hundred Thousand Dollars ($1,500,000.00) (the "Notes"), the form of which is attached as Exhibit A, (ii) a security agreement, which grants the Lenders rights in the Collateral (the "Security Agreement"), the form of which is attached as Exhibit B, and (iii) a lender's rights agreement, which establishes a mechanism for the appointment of an agent and attorney-in-fact for the Lenders to enforce their rights under the Security Agreement (the "Lenders Rights Agreement"), the form of which is attached as Exhibit C.

1.3 It is acknowledged that with respect to all matters set forth in this Agreement requiring the action or consent of the Lenders, Lenders shall act  pursuant to the terms of, and through the Agent appointed in, the Lenders Right Agreement ("Agent").

1.4 All capitalized terms not specifically defined in this Agreement have the respective meanings ascribed to them in the Security Agreement, Notes, or Lenders Rights Agreement, as applicable. In the event of any conflict between this Agreement and the Notes, Security Agreement, or Lenders Rights Agreement, this Agreement shall control.

1.5 In consideration of the foregoing recitals, the making of the loan and of the mutual promises contained in this Agreement, and of other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE II

## LOAN ACCOMMODATION

2.1 The Loans. The Company agrees to take, and Lenders agree to make, upon the terms and conditions contained in this Agreement, loans in the principal sum of up to One Million Five Hundred Thousand Dollars ($1,500,000.00) (the "Loans"). The outstanding principal balance and interest of the Loans shall be repaid, pursuant to the terms of the Notes.

2.2 <u>Documents</u>.  In order to consummate the Loans, the Company will deliver to Lenders the following documents, fully executed, in the form prescribed by Lenders, together with any additional documents, items and funds as Lenders may require in connection with this Agreement:

    (a)   Notes.

    (b)   Security Agreement.

    (c)   Lenders Rights Agreement

    (d)   Such other items as Lenders may reasonably require.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

The Company represents and warrants to Lenders that as of the date of the Effective Date:

3.1 <u>Legal Status</u>.  The Company is a corporation which is duly organized and validly existing under the laws of the State of Delaware, and is qualified and licensed to do business in all jurisdictions in which such qualification or licensing is required, except where the failure to be so qualified and licensed would not have a Material Adverse Effect (as defined below) on the Company.

3.2 <u>Authorization and Validation</u>.  The execution, delivery and performance by the Company of the Loan Documents and the borrowings evidenced by the Notes (a) are within the powers of the Company, (b) have received all necessary corporate approval of the Company's directors, and if applicable, its shareholders, (c) have received all necessary governmental approvals, and (d) will not violate any of the Company's governing instruments, any provisions of law, any order of any court or other agency of government, or any indenture, agreement or any other instrument to which the Company is a party or by which the Company is bound, or be in conflict with, result in any breach of or constitute (with due notice and/or lapse of time) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets, except as contemplated by the provisions of the Loan Documents. The Loan Documents, when executed and delivered to Lenders, will constitute legal, valid and binding obligations of the Company enforceable in accordance with their respective terms.

3.3 <u>Financial Information</u>.  All financial data that has been given to the Lenders with respect to the Company (a) is complete and correct in all material respects, and (b) accurately represents in all material respects the financial condition of the Company as of the date on which, and the results of the Company's operations for the period for which, the same have been furnished. All balance sheets disclose all material liabilities, direct and contingent, as of their respective dates. There has been no adverse change in the financial condition of the Company since the date of the most recent of such financial statements given to the Lenders other than changes in the ordinary course of business, none of which changes individually or in the aggregate has been materially adverse.

3.4 <u>No Defaults</u>.  The Company is not a party to any agreement or instrument that will materially interfere with its performance under the Loan Documents. As of October 31, 2008, except for existing defaults under obligations owing to some of the Lenders and other defaults disclosed to Lenders, the Company is not in default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions set forth in any agreement or instrument to which it is a party.

3.5 <u>Correct Information</u>.  All reports, papers, data and information given to Lenders with respect to the Company are accurate and correct in all material respects and complete insofar as completeness may be necessary to give Lenders a true and accurate knowledge of the subject matters thereof.

3.6 <u>Permits</u>.  The Company possesses all permits, memberships, franchises, contracts, and licenses required and all trademark rights, trade names, trade name rights, patents, patent rights and fictitious name rights necessary to enable it to conduct the business in which it is now engaged without any conflict with the rights of others.

3.7 <u>Principal Place of Business</u>.  The Company's principal place of business is at the address set forth in this Agreement as the address for notices to the Company.  The Company shall promptly notify Lenders of any change in the Company's principal place of business at any time prior to repayment in full to Lenders of the indebtedness secured by the Collateral.

3.8 <u>Taxes</u>.  The Company has filed all federal, state, county and municipal income tax returns required to have been filed by it, and has paid all taxes which have become due pursuant to such returns or pursuant to any assessments received by it, and the Company does not know of any basis for additional assessment in respect of any such taxes.  The Company has no knowledge of any pending assessments or adjustments of its taxes payable with respect to any year.

3.9 <u>Pending Litigation.</u>  Except as set forth in Section 1.01, there is not now pending against or affecting the Company, nor, is there threatened any claim, investigation, action, suit or proceeding at law, or in equity, or before any court or administrative agency which, if adversely determined, would materially impair or affect the financial condition or business operations of the Company.

3.10 <u>No Untrue Statements.</u>  The Company has disclosed all material facts regarding the Company, its business, assets, prospects, and financial condition. No statement by the Company contained in the Loan Documents and no written statement contained in any certificate or other document required to be furnished by the Company, or any of its officers, directors, employees, counsel or other agents to Lenders pursuant to or in connection with the Loan Documents contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact, known by the Company, to be necessary in order to make the statements herein contained not misleading.

## ARTICLE IV

## CONDITIONS PRECEDENT

As a condition to Lenders' obligation to make the Loans and of the Company's right to receive any of the proceeds of the Loans, the following conditions precedent and other requirements shall have been satisfied:

4.1 <u>Correctness of Representations; No Defaults</u>.  The representations and warranties of the Company contained in Article III above shall be true and correct in all material respects on and as of the date of Lenders making any advances hereunder, with the same effect as though such representations and warranties had been made on and as of such date, and on such date no Event of Default as defined herein shall have occurred and no condition, event or act which with the giving of notice or the passage or time or both would constitute such an Event of Default shall have occurred and be continuing or shall exist.

4.2 <u>Legal Review</u>.  All legal matters incidental to the granting of the Loans shall be satisfactory to counsel of Lenders.

## ARTICLE V

## DISBURSEMENTS; PROCEDURE

5.1 <u>Disbursements</u>.  Subject to compliance with the terms and conditions of the Loan Documents, disbursements of the Loans shall be made as follows:

(a)  An initial disbursement of Two Hundred Thousand Dollars ($200,000.00) made by ILC (the "Initial Disbursement").

(b)  After the date of the Initial Disbursement, the Company shall have the ability to request and ILC or such other investors as it shall identify, shall disburse, provided that the Company is not in default under any of the Loan Documents, up to Three Hundred Thousand Dollars ($300,000.00) on an "as-needed" basis, within five (5) business days of the receipt of written request from the Company.

(c)  Commencing January 1, 2009, the Company shall have the ability to request, and Lenders shall disburse, provided that the Company is not in default under any of the Loan Documents and the continued accuracy of the Company's representations and warranties set forth in Article III, disbursements in increments of Two Hundred Fifty Thousand Dollars ($250,000.00) in the aggregate of up to One Million Dollars ($1,000,000.00) on an "as-needed" basis, within ten (10) business days of the receipt of written request from the Company.

5.2 <u>Disbursement Procedure</u>. Loan funds hereunder shall be advanced to the Company upon the written request of the Company's chief executive officer or chief financial officer.  Such request shall be accompanied by an explanation as to the intended use of the funds and a certificate executed by an officer of the Company attesting to the continued accuracy of the representations and warranties set forth in Article III and the full compliance with all the Company's covenants set forth in Article VI.  Assuming the Company is in compliance with the terms of the Loan Documents, and the Lenders do not disapprove the intended use of the funds as not being for the Company's working capital, possible cash shortfalls for the projects of the Company, as well as other expenses related to the conduct of the business activities of the Company, or other uses approved by Lenders, Lenders shall disburse the funds to the Company, pursuant to subsections 5.01(b) and

(c) above, within five (5) or ten (10) business days, as applicable, of the receipt of the written request, or, if the day on which Lenders would otherwise disburse funds is on a day on which a Lender is closed for a weekend or a bank holiday, then on the next regular banking day. Lenders shall not be liable for any error, omission, irregularity, or action taken in good faith with respect to the disbursement of the Loans. The Company acknowledges that it has no right to the Loans other than to have them disbursed by Lenders in strict accordance with this Agreement.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

The Company covenants that so long as the Loans remain outstanding or any liabilities (whether direct or contingent, liquidated or unliquidated) of the Company to Lenders hereunder or under any contracts or instruments executed in connection herewith remain outstanding, and until payment in full of the Notes, the Company shall:

6.1 Punctual Payments. Punctually pay the interest and principal of the Notes at the times and place and in the manner specified in the Notes; and any fees or other liabilities due under the Loan Documents at the times and place and in the manner specified in the Loan Documents, as appropriate. No payments due under the Loan Documents shall be made from undisbursed proceeds of the Loans.

6.2 Existence; Compliance with Law. Preserve and maintain its existence, except where any such action or failure to action could not reasonably be expected to have a Material Adverse Effect (defined below), and maintain all of its material licenses, permits, governmental approvals, rights, privileges and franchises; conduct its business in an orderly, efficient and regular manner; comply with the material provisions of all documents pursuant to which the Company is organized and/or which govern the Company's continued existence; and comply with the requirements of all applicable material laws, rules, regulations, orders of any governmental authority and requirements for the maintenance of the Company's insurance, licenses, permits, governmental approvals, rights, privileges and franchises.

6.3 Facilities. Keep all of the Company's properties necessary to the Company's business in good repair and condition, and from time to time make necessary repairs, renewals and replacements thereto so that the Company's properties shall be preserved and maintained.

6.4 Management. Ensure that the Company's officers and directors who are serving as of the Effective Date maintain their positions as officers and/or directors.

6.5 Taxes and Other Liabilities. Pay and discharge promptly or make due provision therefor, as and when due any and all indebtedness, obligations, assessments and taxes, both real or personal and including without limitation federal and state income taxes.

6.6 Insurance. Maintain insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is customarily carried by companies engaged in the same or similar businesses and owning similar properties in the same general areas in which the Company operates; and

6.7 <u>Litigation</u>.    Promptly give notice in writing to Lenders through Agent of any litigation pending or threatened against the Company having a potential or claimed liability in excess of Twenty-Five Thousand Dollars ($25,000.00).

6.8 <u>Other Notifications</u>.    Promptly (but in no event more than five (5) business days after the occurrence of each such event or matter) give notice in writing to Lenders through Agent of: (a) the occurrence of any event of default, or any condition, event or act which with the giving of notice or the passage of time or both would constitute such an event of default, under the Loan Documents; (b) any loss or casualty suffered at the premises in excess of Ten Thousand Dollars ($10,000.00) in the aggregate; (e) the change in the name, the organizational structure, or dissolution of the Company; (f) any material adverse change in the business, operations, property or financial condition of the Company (a "Material Adverse Effect").

## ARTICLE VII

## <u>NEGATIVE COVENANTS</u>

The Company further covenants that so long as the Loans remain outstanding or any liabilities (whether direct or contingent, liquidated or unliquidated) of the Company to Lenders hereunder or under any contracts or instruments executed in connection herewith remain outstanding, and until payment in full of the Notes, the Company will not without prior written consent of Lenders, which consent may be granted or withheld in Lenders' sole and absolute discretion:

7.1 <u>Use of Funds</u>.    Use any of the proceeds of the Loans for any purposes other than as stated in Article IV hereof.

7.2 <u>Liens</u>.    Create, suffer or permit to exist any security interest, liens, claims or encumbrances on any Collateral pledged to Lenders.

7.3 <u>Fundamental Transactions.</u> Effect any (i) merger or consolidation of the Company other than a merger to effect a re-incorporation, (ii) sale or transfer of all or substantially all of its assets in one or a series of related transactions, (iii) tender offer or exchange offer pursuant to which all of the holders of the Company's capital stock are permitted to tender or exchange their shares for other securities, cash or property, or (iv) any reclassification of the Company's capital stock or any compulsory share exchange pursuant to which the Company's capital stock is effectively converted into or exchanged for other securities, cash or property.

7.4 <u>Directors.</u> Change the authorized number of directors of the Company  or the requirements for a director.

7.5 <u>Business.</u> Expand into a new business unrelated to the current business of the Company.

7.6 <u>Debt.</u> Incur indebtedness in excess of One Hundred Thousand Dollars ($100,000).

7.7 <u>Related Party Transactions.</u> Engage in any transaction with a shareholder, officer or director of the Company unless such transaction is in the ordinary course of business upon terms

which are no less favorable to the Company than could reasonably be expected (as determined by the Board ) to be obtained in a comparable transaction with an unrelated party.

7.8 <u>Executive Officers.</u> Change the appointment, dismissal or compensation arrangements for executive officers.

# ARTICLE VIII

## EXCULPATORY PROVISIONS

The Company acknowledges, understands and agrees as follows:

8.1 <u>Status as Lender</u>. The relationship between the Company and Lenders is and shall at all times remain, solely that of borrower and lender.

8.2 <u>Non-Liability</u>. Lenders shall not be responsible or liable to the Company for any loss, damage or expense of any kind to Person or property caused by the Lenders' activities taken in good faith in accordance with this Agreement whether as to the Company or as to any other Persons or group of Persons and the Company shall protect, indemnify, defend and hold Lenders free and harmless form any such liability, loss, damage or expense, including any attorneys' fees incurred. The consent or approval by Lenders shall not be deemed to waive or render unnecessary the consent or approval to or of any subsequent similar act.

8.3 <u>No Representation</u>. By accepting or approving anything required to be observed, performed or fulfilled, or to be given to Lenders pursuant hereto or pursuant to the Loan Documents, including, but not limited to, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, or insurance policy, Lenders shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation to anyone with respect thereto by Lenders.

8.4 <u>Brokers' Fees</u>. The Company agrees to protect, indemnify, defend (with counsel acceptable to Lenders) and hold Lenders free and harmless from any responsibility, cost and/or liability, including, without limitation, any attorneys' fees and costs incurred, for the payment of any commission, charge or brokerage fees which may be payable in connection with the Loans, it being understood that any such commission, charge or brokerage fees will be paid directly by the Company to the party(ies) entitled thereto.

8.5 <u>Indemnity</u>. The Company agrees to and shall protect, indemnify, defend (with counsel acceptable to Lenders) and hold Lenders, their Affiliates (as defined below), and their directors, officers, agents, employees, successors and assigns free and harmless from and against any and all claims, actions, damages, demands, liabilities, losses, costs and expenses (including without limitation, attorneys' fees) directly or indirectly arising out of or in any way attributable to (a) Lenders' performance of any act permitted under the Loan Documents (unless arising out of a Lender's willful misconduct or gross negligence), and (b) breach of any representation or warranty made by the Company or any obligation of the Company contained in the Loan Documents. Upon demand by Lenders, the Company shall defend any action or proceeding brought against any of the Lenders covered by this indemnity, at the Company's sole cost and expense, unless such Lenders

reasonably elect to conduct their own defense at the expense of the Company, in which event all reasonable attorneys fees and costs of such defense shall be paid by the Company upon demand and shall bear interest at the rate for payment of interest set forth in the Notes from the date of demand until paid. "Affiliates" shall mean with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" or "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

## ARTICLE IX

## BOOKS AND RECORDS

9.1 <u>Books of Account</u>. The Company shall maintain or cause to be maintained full and complete books of account and other records reflecting the results of its operations in accordance with its historic practices in preparing financial statements.

9.2 <u>Financial Information</u>. The Company understands, acknowledges and agrees that Lenders require updated financial information regarding the Company. Accordingly, the Company hereby agrees to provide the following updated financial information to Lenders at the times herein specified:

(a) As soon as practicable after the end of each calendar quarter (and in any event within forty-five (45) days), deliver to the Lenders a quarterly income statement and balance sheet;

(b) As soon as practicable after the end of each fiscal year of the Company (and in any event within ninety (90) days) deliver to Lenders, internally prepared, unaudited financial statements (including without limitation financial statements, asset and liability statements, income and expense statements, cash flow statements, balance sheets, and such other financial information as was previously provided to Lenders or as Lenders may reasonably request), all of which data to be certified as true and accurate and as having been prepared in accordance with United States generally accepted accounting principles applied on a consistent basis during the periods involved; and

(c) Within thirty (30) days after its filing with the Internal Revenue Service by the Company, a copy of the Company's most current federal tax return.

The Company further agrees that the failure of the Company to comply or to cause compliance with the foregoing requirements within the time and in the manner set forth herein shall constitute a default under this Agreement.

9.3 <u>Lender Audit Rights</u>. Lenders and their agents and representatives shall have the right to inspect and audit all books and records of the Company pertaining to the statements, reports and information required under this Article IX in order to obtain and verify such information as Lenders deem necessary or appropriate. The cost of any and all such inspections and

audits shall be paid by the Company. Provided no Event of Default has occurred and is continuing under this Agreement, Lenders shall give the Company reasonable notice prior to exercising their rights hereunder and shall conduct its activities during normal business hours and in a manner which shall not disrupt the Company's business activities.

# ARTICLE X

## EVENTS OF DEFAULT

  10.1   <u>Events of Default</u>. The occurrence of any of the following shall constitute an "Event of Default" under this Agreement:

    (a) The Company shall fail to pay when due any principal or interest under any of the Notes, or shall fail to pay when due any fees, costs, charges, or other amounts payable under the Loan Documents;

    (b) Upon the Lenders' request, the Company shall fail to convert the Notes into shares of the Company's capital stock issuable upon a Funding Event (defined below);

    (c) Any covenant, representation or warranty made by the Company in the Loan Documents or any other documents executed by the Company in connection with the Loans is or becomes false or misleading in any material respect;

    (d) The Company shall fail to observe or perform any non-monetary term, obligation, agreement or other provision contained in the Loan Documents or in any other contract or instrument executed in connection herewith which default shall continue for ten (10) days following written notice by Lenders;

    (e) Any default or defined event of default under any other documents executed in connection with the Loans which default shall continue for ten (10) days following written notice by Lenders;

    (f) The filing of a notice of judgment lien the Company, or the recording of any abstract of judgment against the Company, or the service of a notice of levy and/or execution against substantially all of the assets of the Company which is not dismissed within sixty (60) days, or the entry of a judgment, order or decree against the Company, any or all of which would have a Material Adverse Effect upon the Company's ability to perform under the Loan Documents; provided however, that the filing of a notice of appeal for any judgment shall be deemed as a satisfactory means of mitigating any such notice and adverse effect.

    (g) The dissolution or liquidation of the Company or the Company, its shareholders or the shareholders or constituents of any of its shareholders, shall take action seeking to effect the dissolution or liquidation of the Company without the consent of Lenders, which consent may be withheld in Lenders' sole and absolute discretion;

    (h) If the Company shall default in the payment or performance of any material obligation, or any defined event of default, under the terms of any material contract or instrument pursuant to which the Company has incurred any debt or other liability to Lenders, which default is not cured within any grace and cure period expressly provided in such contract or instrument;

P:00448613.4:60375.002

27

# ARTICLE XI

## REMEDIES

11.1 <u>Remedies</u>. Upon or at any time after the happening of any uncured Event of Default hereunder, Lenders, in addition to any and all rights and remedies otherwise available to them by law or in equity, as secured parties under the California Uniform Commercial Code or otherwise, shall have the following rights and remedies:

(a) Declare all funds disbursed pursuant to the Loans hereunder to be due and payable and terminate any obligation of Lenders to disburse or advance any of the funds hereunder to the Company and proceed as authorized by law to satisfy the indebtedness of the Company to Lenders, and, in that regard, Lenders shall be entitled to all of the rights, privileges and benefits contained in the Security Agreement and Lenders Rights Agreement.

(b) Upon the happening of any Event of Default which may be cured by payment of money, Lenders shall have the right (but not the obligation) to make such payment from their own funds. The making by Lenders of such payment out of the Lenders' own funds shall not, however, be deemed to cure such default by the Company, and the same shall not be so cured unless and until the Company shall have reimbursed Lenders for such payment. If Lenders advance their own funds for such purposes, such funds shall be considered advances under the Notes and shall be secured by the Security Agreement, notwithstanding that such advances may cause the total amount advanced hereunder to exceed the face amount of the Notes or the amount committed to be advanced pursuant to this Agreement, and the Company shall immediately upon demand reimburse Lenders with interest at the default interest rate provided for in the Notes from the date of such advance until the date of reimbursement.

11.2 <u>Application of Other Funds</u>. Upon acceleration of the due date of the Notes, Lenders' obligations to disburse funds under any other loans from Lenders to the Company, and any other funds held on account of the Company, shall forthwith terminate; and Lenders may, at their option, apply all or any part of such funds as they deem appropriate in their sole but reasonable discretion, provided that such application shall not operate to waive or cure any default existing under the Loan Documents and shall not prejudice any rights of Lenders under the Loan Documents.

11.3 <u>Remedies Cumulative</u>. All remedies of Lenders provided for herein are cumulative and shall be in addition to any and all other rights and remedies provided in the Loan Documents, or provided by law. The exercise of any right or remedy by Lenders hereunder shall not in any way constitute a cure or waiver of default hereunder or under the Loan Documents, or invalidate any act done pursuant to any notice of default, or prejudice Lenders in the exercise of any of their rights hereunder or under the Loan Documents unless, in the exercise of said rights, Lenders realize all amounts owed to them under the Loan Documents.

11.4 <u>Contest of Third Party Claims</u>. Notwithstanding anything to the contrary herein contained, the Company shall have the right to contest in good faith any claim, demand, levy or assessment by any third party, the assertion of which would constitute a default hereunder. Any such contest shall be prosecuted diligently and in a manner not prejudicial to Lenders or their rights hereunder. Upon demand by Lenders, the Company shall make suitable provision by deposit of

funds with Lenders, by bond satisfactory to Lenders, or by such other device as Lenders may approve in writing, for the possibility that the contest will be unsuccessful. Such provision shall be made within ten (10) days after demand therefore and, if made by deposit of funds with Lenders, the amount so deposited shall be disbursed in accordance with the resolution of the contest either to the Company or the adverse claimant.

11.5    No Waivers. No waiver by Lenders of any default or breach by the Company hereunder shall be implied from any omission by Lenders to take action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default in the waiver and it shall be operative only for the time and to the extent therein stated. Waivers of any covenant, term or condition contained herein shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition.

## ARTICLE XII

## ANTI-DILUTION RIGHTS

If the Company consummates any transaction in which the Company receive funds through the issuance of securities to any person, including a rights offerings to its shareholders (a "Funding Event"), then each Lender shall have the right thereafter to participate in such Funding Event and the right to purchase the same amount and kind of securities, cash or property as it would have been entitled to receive upon the occurrence of such Funding Event if it had been, immediately prior to such Funding Event, the holder of the number of shares of the Company's capital stock then issuable upon conversion of the Note (the "Anti-Dilution Rights"). If holders of the Company's capital stock are given any choice as to the securities, cash or property to be received in the Funding Event, then the Lender shall be given the same choice as to the Anti-Dilution Rights it receives upon any conversion of the Note following such Funding Event.

## ARTICLE XIII

## SURVIVAL OF WARRANTIES AND COVENANTS

The warranties, representations, covenants and agreements set forth herein and in the Loan Documents shall survive the making of the Loans and the execution and delivery of the Notes, and shall continue in full force and effect until the indebtedness secured by the Collateral under the Security Agreement shall have been paid in full.

## ARTICLE XIV

## ASSIGNMENT

14.1    The Company's Assignment. The Company shall not assign this Agreement or any interest it may have in the monies due hereunder, without the consent of Lenders, which consent may be withheld in the sole and absolute discretion of Lenders.

14.2    Lender's Assignment. Lenders individually or in the aggregate may at any time assign their respective interests in the Loan Documents, and upon such assignment, Lenders shall have no further obligation or liability for any obligation arising after such assignment of any nature in connection herewith. Upon such assignment, the provisions of this Agreement shall

continue to apply to the Loans and such assignee shall be substituted in the place of the assigning Lender hereunder with all rights, obligations and remedies of such Lender herein provided, including, without limitation, the right to so further assign this Agreement and the Loan Documents pursuant to the terms hereof.

14.3    Participation.  The Company understands that Lenders may transfer and assign their interest in the Loans and the Loan Documents, pledge their interest in the Loans and the Loan Documents or grant or sell participations in some or all of the Company's indebtedness outstanding under the Loans.  In connection with any such transaction, Lenders may disclose to each prospective and actual transferee, pledgee, purchaser or participant, any and all documents and information relating to the Loans.  The Company shall execute such estoppels and confirmations as Lenders may require in order to facilitate such financings or participations.

## ARTICLE XV

## MISCELLANEOUS

15.1    Return of Documents.  If the Loans are not consummated within thirty (30) days after the date hereof, the Company shall return all documents and instruments to Lenders upon demand.

15.2    Governing Law and Venue.  This Agreement shall be governed by and construed in accordance with the laws of the State of California (without regard to conflict of laws principles).  Each of the parties hereto agrees that any action or proceeding against it arising out of or in connection with this Agreement may be commenced and maintained in any state or federal court within San Diego, California and that the state and federal courts of the State of California shall have exclusive jurisdiction with respect to the subject matter hereof and the parties hereto.

15.4    Further Assurances.  Each party to this Agreement shall execute and deliver all instruments and documents and take all actions as may be reasonably required or appropriate to carry out the purposes of this Agreement.

15.5    Counterparts and Exhibits.  This Agreement may be executed in counterparts, each of which is deemed an original and all of which together constitute one document.  All exhibits attached to and referenced in this Agreement are incorporated into this Agreement.

15.6    Time of Essence.  Time and strict and punctual performance are of the essence with respect to each provision of this Agreement.

15.7    Attorney's Fees.  The prevailing party(ies) in any litigation, arbitration, mediation, bankruptcy, insolvency or other proceeding ("Proceeding") relating to the enforcement or interpretation of this Agreement may recover from the unsuccessful party(ies) all costs, expenses, and actual attorney's fees (including expert witness and other consultants' fees and costs) relating to or arising out of (a) the Proceeding (whether or not the Proceeding proceeds to judgment), and (b) any post-judgment or post-award proceeding including, without limitation, one to enforce or collect any judgment or award resulting from the Proceeding.  All such judgments and awards shall

contain a specific provision for the recovery of all such subsequently incurred costs, expenses, and actual attorney's fees.

15.8    Modification. This Agreement may be modified only by an instrument in writing executed by the party to this Agreement against whom enforcement of the modification is sought.

15.9    Headings. The section headings in this Agreement: (a) are included only for convenience, (b) do not in any manner modify or limit any of the provisions of this Agreement, and (c) may not be used in the interpretation of this Agreement.

15.10    Prior Understandings. This Agreement and all documents specifically referred to and executed in connection with this Agreement: (a) contain the entire and final agreement of the parties to this Agreement with respect to the subject matter of this Agreement, and (b) supersede all negotiations, stipulations, understandings, agreements, representations and warranties, if any, with respect to such subject matter, which precede or accompany the execution of this Agreement.

15.11    Interpretation. Whenever the context so requires in this Agreement, all words used in the singular may include the plural (and vice versa) and the word "Person" includes a natural person, a corporation, a firm, a partnership, a joint venture, a trust, an estate or any other entity. The terms "includes" and "including" do not imply any limitation. For purposes of this Agreement, the term "day" means any calendar day and the term "business day" means any calendar day other than a Saturday, Sunday or any other day designated as a holiday under California Government Code Sections 6700-6701. Any act permitted or required to be performed under this Agreement upon a particular day which is not a business day may be performed on the next business day with the same effect as if it had been performed upon the day appointed. No remedy or election under this Agreement is exclusive, but rather, to the extent permitted by applicable law, each such remedy and election is cumulative with all other remedies at law or in equity.

15.12    Partial Invalidity. Each provision of this Agreement is valid and enforceable to the fullest extent permitted by law. If any provision of this Agreement (or the application of such provision to any Person or circumstance) is or becomes invalid or unenforceable, the remainder of this Agreement, and the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, are not affected by such invalidity or unenforceability, unless such provision or the application of such provision is essential to this Agreement.

15.13    Notices. Each notice and other communication required or permitted to be given under this Agreement ("Notice") must be in writing. Notice is duly given to another party upon: (a) hand delivery to the other party, (b) receipt by the other party when sent by facsimile to the address and number for such party set forth at the end of this Agreement (provided, however, that the Notice is not effective unless a duplicate copy of the facsimile Notice is promptly given by one of the other methods permitted under this Section), (c) three (3) business days after the Notice has been deposited with the United States postal service as first class certified mail, return receipt requested, postage prepaid, and addressed to the party at the address for such party set forth at the end of this Agreement, or (d) the next business day after the Notice has been deposited with a reputable overnight delivery service, postage prepaid, addressed to the party at the address for such

party set forth at the end of this Agreement with next-business-day delivery guaranteed, provided that the sending party receives a confirmation of delivery from the delivery-service-provider. Each party shall make a reasonable, good faith effort to ensure that it will accept or receive Notices to it that are given in accordance with this Section. A party may change its address for purposes of this Section by giving the other party written notice of a new address in the manner set forth above.

15.14    Waiver. Any waiver of a default or provision under this Agreement must be in writing. No such waiver constitutes a waiver of any other default or provision concerning the same or any other provision of this Agreement. No delay or omission by a party in the exercise of any of its rights or remedies constitutes a waiver of (or otherwise impairs) such right or remedy. A consent to or approval of an act does not waive or render unnecessary the consent to or approval of any other or subsequent act.

15.15    Drafting Ambiguities. Each party to this Agreement has reviewed and revised this Agreement and has had the opportunity to have such party's legal counsel review and revise this Agreement. The rule of construction that ambiguities are to be resolved against the drafting party or in favor of the party receiving a particular benefit under an agreement may not be employed in the interpretation of this Agreement or any amendment to this Agreement.

15.16    Third Party Beneficiaries. Nothing in this Agreement is intended to confer any rights or remedies on any Person other than the parties to this Agreement and their respective successors-in-interest and permitted assignees, unless such rights are expressly granted in this Agreement to another Person specifically identified as a "Third Party Beneficiary."

15.17    Reliance on Representations. Lenders may conclusively assume that the statements, acts, information and representations made by the Company or its agents contained in any affidavits, orders, receipts or other written instruments which were filed with Lenders or exhibited to them are true and correct and may rely thereon without any investigation or inquiry, and any payment made by Lenders in reliance thereon shall completely release Lenders from liability with respect to all sums so paid.

15.18    Fees. The Company shall pay all reasonable fees of counsel for the Lenders incurred in connection with the preparation, negotiation and execution of the Loan Documents and all other documents and matters related thereto.

*[Signature page follows.]*

## Signature Page for Loan Agreement

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

COMPANY:                           PHAGE BIOTECHNOLOGY CORPORATION, a
                                   Delaware corporation

                                   By:_____
                                   Name:_____
                                   Its:_____

LENDERS:                           _____


                                   By:_____
                                   Name:_____
                                   Its:_____

                                   _____


                                   By:_____
                                   Name:_____
                                   Its:_____

                                   _____


                                   By:_____
                                   Name:_____
                                   Its:_____

                                   _____


                                   By:_____
                                   Name:_____
                                   Its:_____

**EXHIBIT A**
**FORM OF SECURED CONVERTIBLE PROMISSORY NOTE**

**EXHIBIT B**
**FORM OF SECURITY AGREEMENT**

# EXHIBIT C
# FORM OF LENDERS' RIGHTS AGREEMENT

THE SECURITIES REPRESENTED BY THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES COMMISSIONER OF ANY STATE AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. EXCEPT AS SET FORTH IN SECTION 14 OF THIS NOTE, NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR STATE SECURITIES LAWS.

## SECURED CONVERTIBLE PROMISSORY NOTE

U.S. $_____                                                    _____, 2008


For value received, Phage Biotechnology Corporation, a Delaware corporation (the "Company"), promises to pay to the order of _____, or order (including all successors and assigns, the "Lender"), the principal sum of _____U.S. Dollars (U.S. $_____), or as much of such principal sum as may be advanced and outstanding, together with all accrued and unpaid interest thereon, on or before the date such payment is required under this Secured Convertible Promissory Note (this "Note"). This Note is one of a series of promissory notes made pursuant to the terms of the Loan Agreement, Security Agreement and Lenders Rights Agreement dated concurrently herewith. It is acknowledged that with respect to all matters set forth in this Note requiring the action or consent of the Lender, Lender shall act pursuant to the terms of, and through the Agent appointed in, the Lenders Right Agreement ("Agent"). Capitalized terms not defined herein shall have the respective meanings ascribed to them in the Loan Agreement, Security Agreement or Lenders Rights Agreement, as applicable. In the event of any conflict between this Note and the Loan Agreement, Security Agreement, or Lenders Rights Agreement, the Loan Agreement shall control.

The following is a statement of the rights of the Lender of this Note and the conditions to which this Note is subject, and to which the Lender hereof, by the acceptance of this Note, agrees:

1.  _Limitation on Use of Proceeds._  The Company will use the funds it borrows under this Note exclusively as described in the Loan Agreement.

2.  _Interest._

2.1.  Interest shall accrue on each advance from the date of its disbursement until paid at a rate equal to ten percent (10.0%) per annum.

2.2.  Notwithstanding anything to the contrary contained in this Note, in no event shall the Company be required to pay interest on the principal amount outstanding under this Note at a rate in excess of the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the outstanding principal balance under this Note under the laws of the State of California (the "Maximum Lawful Rate"), and if the effective rate of interest which would otherwise be payable under this Note would exceed the

Maximum Lawful Rate, or if the Lender shall receive monies that are deemed to constitute interest which would increase the effective rate of interest payable under this Note to a rate in excess of the Maximum Lawful Rate, then: (i) the amount of interest which would otherwise be payable under this Note shall be reduced to the Maximum Lawful Rate, and (ii) any interest paid by the Company in excess of the Maximum Lawful Rate shall, at the option of the Lender, be either refunded to the Company or credited against the principal of this Note. It is further agreed that, without limitation of the foregoing, all calculations of the rate of interest contracted for, charged or received by the Lender that are made for the purpose of determining whether such rate exceeds the Maximum Lawful Rate shall be made, to the extent permitted by the applicable law (now or hereafter enacted), by amortizing, prorating and spreading in equal parts during the period the Note is outstanding all interest at any time contracted for, charged or received by the Lender.

2.3. Subject to the usury limitations set forth in subsection 2.2, after the occurrence and during the continuance of any Event of Default (as defined in the Loan Agreement), interest shall accrue on the unpaid principal amount and any interest that has not been paid when due at a rate equal to four percent (4.0%) per annum above the rate otherwise provided in subsection 2.1. If any interest is not paid when due it shall accrue and be added to principal as of the first business day of each month.

3. Disbursements. The Company may, from time to time, before the Maturity Date (as defined below), request from Lender, and Lender shall disburse, provided that the Company is not in default under any of the Loan Documents, amounts under this Note until the Company has borrowed principal in the amount set forth in the introductory paragraph, subject to all of the limitations, terms and conditions of the Loan Documents, within ___ (__) business days of the receipt of written request from the Company. Each request shall be accompanied by a certificate executed by an officer of the Company attesting to the continued accuracy of the representations and warranties set forth in the Loan Agreement and full compliance with all of the Company's covenants set forth in the Loan Agreement. All disbursements made under this Note shall be recorded on attached Exhibit A.

4. Maturity. Subject to Section 6, principal and any accrued but unpaid interest under this Note shall be due and payable upon the earlier of: (a) twelve (12) months from the date of the Initial Disbursement (as defined in the Loan Agreement), (b) upon the occurrence of the closing of a Funding Event (" Funding Closing Date"), or (c) the occurrence of an Event of Default (each, a "Maturity Date").

5. Security. This Note is secured by the Collateral pursuant to the terms of a security agreement between Company and Agent on behalf of Lenders (the "Security Agreement") as effected through the Lenders Rights Agreement.

6. Mandatory Prepayment. The Company shall make a mandatory prepayment of the obligations under this Note in an amount equal to the entire outstanding principal balance of the Note, together with all accrued and unpaid interest thereon, upon the occurrence of any of the following events: (a) the sale or transfer of fifty percent (50%) or more of the equity interest of the Company to any person or group, or (b) any sale or transfer of fifty percent (50%) or more of the assets (including intangible assets) of the Company in a single transaction or series of related transactions.

7.     <u>Conversion.</u>

7.1.     <u>Funding Event.</u>  All or any portion of the principal amount of and accrued interest on this Note shall, at the Lender's option, be converted into shares of the Company's capital stock ("ME Stock") issued pursuant to, and on the Funding Closing Date. Each share of ME Stock to be issued upon such conversion shall be issued at a price per share equal to seventy-five percent (75%) of the price at which each share is sold in the Funding Event, rounded up or down to the nearest whole share. The Lender shall give the Company no less than two (2) business days notice of conversion of this Note in whole or in part. Interest on this Note shall cease to accrue with respect to any portion of the Note that is converted into the ME Stock on the date that such ME Stock is issued to the Lender.

7.2.     <u>Mechanics and Effect of Conversion.</u>  No fractional shares of ME Stock will be issued upon conversion of this Note. In lieu of any fractional share to which the Lender would otherwise be entitled, the Company will pay to the Lender in cash the amount of the unconverted principal and interest balance of this Note that would otherwise be converted into such fractional share. Upon conversion of this Note pursuant to this Section 7, the Lender shall surrender this Note, duly endorsed, at the principal offices of the Company or any transfer agent of the Company. At its expense, the Company will, within two (2) business days, issue and deliver to such Lender, at such principal office, a certificate or certificates for the number of shares of ME Stock to which such Lender is entitled upon such conversion, together with any other securities and property to which the Lender is entitled upon such conversion under the terms of this Note, including a check payable to the Lender for such cash amounts payable as described herein. Upon conversion of this Note, the Company will be released from all of its obligations and liabilities under this Note with regard to that portion of the principal amount and accrued interest being converted.

8.     <u>Notice of Corporate Events.</u>  The Company shall deliver to Lender a notice describing the material terms and conditions of any transaction which requires the consent of the Lenders pursuant to Article VII of the Loan Agreement. The Company shall deliver such notice at least ten (10) calendar days prior to the applicable record or effective date on which a person would need to hold the Company's capital stock.

9.     <u>Payment.</u>  All payments shall be made in lawful money of the United States of America at such place as the Lender hereof may from time to time designate in writing to the Company. Payment shall be credited first to the accrued interest then due and payable and the remainder shall be applied to principal. Prepayment of this Note may be made in whole but not in part at any time without premium or penalty, upon five (5) business days prior written notice to the Lender, during which period the Lender shall be entitled to exercise its conversion rights under Section 7 of this Note with respect to all or any portion of the obligations under this Note, as the Lender determines in its sole discretion. Not more than two (2) business days after the Company is notified by the Lender hereof of the election of the Lender in connection with such prepayment of this Note, to effect conversion of this Note or to receive repayment in cash, or any combination of the foregoing, the Company shall issue such capital stock and/or repay the outstanding principal balance of this Note, together with all accrued and unpaid interest thereon, and shall pay all other obligations of the Company hereunder.

10.     <u>Company's Representations and Warranties.</u>  To induce Lender to advance any monies pursuant to the terms of this Note, Company hereby affirmatively covenants to: (a) use the

monies advanced under this Note solely as set forth in the Loan Agreement; and (b) repay the principal and interest according to the terms of this Note.

11.    Events of Default.  Upon the occurrence of any of Event of Default (as defined in the Loan Agreement) then, at the option of the Lender, in each case without notice to or demand upon the Company or any other party, the entire principal balance hereof together with all accrued and unpaid interest thereon shall become immediately due and payable, and the Lender shall have all rights and remedies available to it under the Loan Documents and applicable law.

12.    Costs and Expenses.  The Company agrees to pay all costs and expenses (including fees and disbursements of counsel) incident to the enforcement of payment of the Note, whether or not any action or proceeding is commenced, before as well as after judgment including, without limitation, in connection with bankruptcy, insolvency, liquidation, reorganization, moratorium or other similar proceedings involving the Company or a "workout" of the obligations.

13.    Acceptance of Past Due Payments and Indulgences Not Waivers.  None of the provisions hereof and none of the Lender's rights or remedies hereunder on account of any past or future defaults shall be deemed to have been waived by the Lender's acceptance of any past due installments or by any indulgence granted by the Lender to the Company.

14.    Waivers by the Company; No Setoffs or Counterclaims.  The Company and its successors and assigns, hereby waive presentment, demand, protest and notice thereof or of dishonor, and agree that they shall remain liable for all amounts due hereunder notwithstanding any extension of time or change in the terms of payment of this Note granted by the Lender, or any delay or failure by the Lender to exercise any rights under this Note.  The Company hereby waives the right to plead any and all statutes of limitation as a defense to a demand hereunder to the full extent permitted by law.  All payments required by this Note shall be made by without setoff or counterclaim.

15.    Transfer; Successors and Assigns.  The Company may not assign its rights or obligations under this Note without the prior written consent of the Lender, which consent may be granted or withheld in Lender's sole and absolute discretion, and any such purported assignment by the Company without obtaining the prior written consent of the Lender shall be void ab initio.  The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of Lender.

16.    Governing Law; Jurisdiction.  This Agreement shall be governed by and construed in accordance with the laws of the State of California (without regard to conflict of laws principles).  Each of the parties hereto agrees that any action or proceeding against it arising out of or in connection with this Agreement may be commenced and maintained in any state or federal court within San Diego, California and that the state and federal courts of the State of California shall have exclusive jurisdiction with respect to the subject matter hereof and the parties hereto.

17.    Notices.  Each notice and other communication required or permitted to be given under this Agreement ("Notice") must be in writing.  Notice is duly given to another party upon: (a) hand delivery to the other party, (b) receipt by the other party when sent by facsimile to the address and number for such party set forth at the end of this Agreement (provided, however, that the Notice is not effective unless a duplicate copy of the facsimile Notice is promptly given by one of

the other methods permitted under this Section), (c) three (3) business days after the Notice has been deposited with the United States postal service as first class certified mail, return receipt requested, postage prepaid, and addressed to the party at the address for such party set forth at the end of this Agreement, or (d) the next business day after the Notice has been deposited with a reputable overnight delivery service, postage prepaid, addressed to the party at the address for such party set forth at the end of this Agreement with next-business-day delivery guaranteed, provided that the sending party receives a confirmation of delivery from the delivery-service-provider. Each party shall make a reasonable, good faith effort to ensure that it will accept or receive Notices to it that are given in accordance with this Section. A party may change its address for purposes of this Section by giving the other party written notice of a new address in the manner set forth above.

18.    <u>Amendments and Waivers</u>. Any term of this Note may be amended only with the written consent of the Company and the Lender. Any amendment or waiver effected in accordance with this Section 18 shall be binding upon the Company, the Lender and each holder of the Note.

19.    <u>Further Assurances</u>. The parties hereto agree to make, execute and deliver or cause to be made, executed and delivered, to the requesting party such other instruments or documents, and to take such other actions as the requesting party may reasonably require to carry out the terms of this Note and the transactions contemplated hereby.

20.    <u>No Rights as an Equity Lender.</u> Prior to the conversion of this Note, the Lender shall not have or exercise any rights as an equity holder of the Company by virtue of its ownership of this Note unless specifically set forth herein.

21.    <u>Relationship as Creditor and Debtor Only.</u> Lender and the Company intend that the relationship between them under this Note is solely that of creditor and debtor. Nothing contained in this Note or in any other document or instrument may be construed to create by the loan or repayment of the loan evidenced by this Note a capital contribution, compensation, a partnership, joint venture or co-ownership by or between them.

22.    <u>Partial Invalidity.</u> Each provision of this Note is valid and enforceable to the fullest extent permitted by law. If any provision of this Note is or becomes invalid or unenforceable, the remainder of this Note will not be affected by such invalidity or unenforceability.

23.    <u>Attorney's Fees.</u> The prevailing party in any litigation, arbitration, mediation, bankruptcy, insolvency or other proceeding ("Proceeding") relating to the enforcement or interpretation of this Agreement may recover from the unsuccessful party all costs, expenses, and actual attorney's fees (including expert witness and other consultants' fees and costs) relating to or arising out of (a) the Proceeding (whether or not the Proceeding proceeds to judgment), and (b) any post-judgment or post-award proceeding including, without limitation, one to enforce or collect any judgment or award resulting from the Proceeding. All such judgments and awards shall contain a specific provision for the recovery of all such subsequently incurred costs, expenses, and actual attorney's fees.

The parties have executed this Secured Convertible Promissory Note as of the date first written above.

**COMPANY:**

**PHAGE BIOTECHNOLOGY CORPORATION.**

By:_____

Name:_____

Title:_____

Address:

**AGREED TO AND ACCEPTED**:

_____

By:_____
Name:_____
Title: _____


Address:

**EXHIBIT A**

<u>SCHEDULE OF DISBURSEMENTS</u>

| <u>Date of<br>Disbursement</u> | <u>Amount of<br>Disbursement</u> | <u>Principal Balance<br>as of Dates of<br>Disbursement</u> |
|---|---|---|
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |
| _____ | $_____ | $_____ |

## SECURITY AGREEMENT

This Security Agreement (this "Agreement") is entered into as of _____, 2008 (the "Effective Date"), by and between Phage Biotechnology Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Company"), and Richard Ritter in his capacity as Agent (as defined in Lenders Rights Agreement) for the benefit of Lenders (as defined in the Loan Agreement) (collectively, the "Lenders") as secured party. The parties agree as follows:

1.    Recitals.

    1.1.    The Company and Lenders are executing the following agreements, which shall collectively be referred to, together with this Agreement, as the "Loan Documents": (a) the Loan Agreement, (b) the Secured Convertible Promissory Note(s), in the aggregate amount of up to $1,500,000.00 (the "Notes"), and (c) the Lenders Rights Agreement.

    1.2.    Pursuant to the Lenders Rights Agreement, each Lender has appointed and authorized the Agent to act as collateral agent under this Agreement. The Lenders Rights Agreement establishes a mechanism for the appointment of Agent and attorney-in-fact for the Lenders to enforce their rights under this Agreement. It is acknowledged that with respect to all matters set forth in this Agreement requiring the action or consent of the Lenders, Lenders are acting pursuant to the terms of, and through Agent.

    1.3.    The Company has agreed to grant a security interest (the "Security Interest") in the Collateral (as defined below) to secure payment and other obligations arising under the Loan Documents.

2.    Definitions. All capitalized terms not specifically defined in this Agreement have the meaning ascribed to them in the Loan Agreement, Notes, or Lenders Rights Agreement, as applicable, or if not defined in this Agreement, the Loan Agreement, Notes, or Lenders Rights Agreement shall have the meanings set forth in the California Uniform Commercial Code (the "UCC"). In the event of any conflict between this Agreement and the Notes, Loan Agreement, or Lenders Rights Agreement, the Loan Agreement shall control. For purposes of this Agreement, the following definitions shall apply:

    2.1.    "Accounts" shall mean all "accounts" as defined in the UCC now owned or hereafter acquired by the Company, including without limitation all accounts receivable, contract rights, notes, drafts and other obligations or indebtedness owing to the Company and arising from whatever source (including bank deposits and accounts) (including without limitation any such obligation which might be characterized as an account, contract right or general intangible under the UCC in effect in any jurisdiction) and all of the rights of the Company in, to and under all purchase orders for goods, services or other property, and all of the rights of the Company to any goods, services or other property represented by any of the foregoing (including returned or repossessed goods and unpaid sellers' rights of rescission, replevin, reclamation and rights to stoppage in transit) and all monies due to or to become due to the Company under all contracts for the sale, lease or exchange of goods or other property and/or the performance of services by it (whether or not yet earned by performance on the part of the Company), in each case whether now in existence or hereafter arising or acquired including, without limitation, the right to receive the proceeds of said

purchase orders and contracts and all collateral security and guarantees of any kind given by any Person with respect to any of the foregoing.

2.2.    "Collateral" means all: Accounts; Documents; Equipment; General Intangibles; Instruments; Inventory; all assets of the Company, including all other personal property of the Company; all books and records (including, without limitation, customer lists, supplier lists, credit files, computer programs, printouts and other computer materials and records) of the Company pertaining to any of the Collateral; all Proceeds of any of the Collateral described in this subsection 2.2; and all intellectual property, including all patents, patent applications, tradenames, trademarks, domain names and other commercial identifiers including those listed on attached Exhibit A.

2.3.    "Documents" shall mean all "documents" as defined in the UCC or other receipts covering, evidencing or representing goods, now owned or hereafter acquired by the Company.

2.4.    "Equipment" shall mean all "equipment" as defined in the UCC, now owned or hereafter used or acquired for use in the business or otherwise of the Company (together with all accessions thereto and all substitutions and replacements thereof and parts therefor), whether or not the same shall be deemed affixed to real property, and all rights under or arising out of present or future contracts relating to the acquisition or use of the above.

2.5.    "General Intangibles" shall mean all "general intangibles" as defined in the UCC now owned or hereafter acquired by the Company, including without limitation (a) all obligations or indebtedness owing to the Company (other than Accounts) from whatever source arising, (b) all patent licenses, patents, trademark licenses, trademarks, rights in intellectual property, goodwill, trade names, service marks, trade secrets, copyrights, permits and licenses, (c) all rights or claims in respect of refunds for taxes paid, and (d) all rights in respect of any pension plan or similar arrangement maintained for employees of the Company or any of its subsidiaries.

2.6.    "Instruments" shall mean (a) all "instruments," "chattel paper," or "letters of credit" each as defined in the UCC, evidencing, representing, arising from or existing in respect of, relating to, securing or otherwise supporting the payment of, any of the Accounts, including without limitation promissory notes, drafts, bills of exchange and trade acceptances, and (b) notes or other obligations or indebtedness owing to a the Company from whatever source arising, in each case now owned or hereafter acquired by the Company.

2.7.    "Inventory" shall mean all "inventory" as defined in the UCC, now owned or hereafter acquired by the Company, wherever located, including without limitation all raw materials and other materials and supplies, work-in-process and finished goods and any products made or processed therefrom and all substances, if any, commingled therewith or added thereto.

2.8.    "Proceeds" shall mean all proceeds of, and all other profits, rentals or receipts, in whatever form, arising from the collection, sale, lease, exchange, assignment, licensing or other disposition of, or realization upon, any item or portion of the Collateral, including without limitation all claims of the Company against third parties for loss of, damage to, destruction of, or for proceeds payable under, or unearned premiums with respect to, policies of insurance in respect

of, any Collateral and any condemnation or requisition payments with respect to any Collateral, in each case whether now existing or hereafter arising.

3.    <u>Grant of Security Interest.</u>

3.1.    As security for the payment and performance of the Company's obligations and covenants under the Loan Documents, the Company hereby grants to Agent for the benefit of Lenders a continuing first priority Security Interest in the Collateral (as defined above), whether now owned or existing or hereafter acquired or arising and regardless of where located. In order to perfect the Security Interest, concurrently with the Effective Date (i) a form UCC-1 financing statement in favor of Agent for the benefit of Lenders listing the Collateral shall be filed in the manner prescribed by the UCC; and (ii) to the extent necessary, the applicable form(s) prescribed by the United States Patent and Trademark Office (the "PTO") in favor of Agent for the benefit of Lenders listing all the patents, patent applications, registered names, marks and commercial identifiers included among the Collateral shall be filed in the manner prescribed by the PTO, which form(s) the Company will duly execute, acknowledge and deliver to Lenders on or before the Effective Date.

4.    <u>The Company's Covenants.</u> The Company warrants and agrees that as long as this Agreement remains in effect:

4.1.    The Company shall take all commercially reasonable necessary steps to defend the Collateral against claims and demands of others, but not including continued use to preserve any rights to any tradename, trademark, or patent or any actions required to register or prosecute any tradename, trademark, or patent that is/are not already so registered with the PTO as of the date of this Agreement;

4.2.    The Company shall promptly notify Agent for the benefit of Lenders in writing of any event which does or which may materially and adversely affect the value of the Collateral;

4.3.    The Company shall maintain the Security Interest granted hereunder as a valid and enforceable first priority lien on and security interest in the Collateral;

4.4.    The Company shall pay, on demand, all costs and expenses (including attorney's fees) reasonably incurred or paid by Agent of behalf of Lenders in exercising any right, power or remedy under this Agreement, or in any way relating to the enforcement of Lenders' rights under this Agreement;

4.5.    Except for the Security Interest herein granted, the Company shall maintain the Collateral without any further encumbrance, except with the prior written consent of Agent for the benefit of Lenders, which may be withheld or granted in Agent's sole and absolute discretion;

4.6.    The Company hereby appoints Agent as its agent in fact to do all acts required of the Company after Default (as defined below), it being acknowledged by the Company that such appointment is coupled with an interest and is irrevocable;

4.7.    At Agent's request, the Company shall:

4.7.1.    file any financing statements, assignments, instruments of transfer or notices that may be required in order to give notice of, reflect the grant of or perfect the Security Interest granted hereunder and after Default notify any persons designated by Agent of Lenders' interest in the Collateral;

4.7.2.    after Default, upon Agent's request, segregate all collections of money and other property under or in respect of the Collateral and deliver promptly upon receipt such collections to Agent in kind; and

4.8.    The Company shall pay prior to delinquency all taxes, charges, liens and assessments against the Collateral, subject to the Company's right to contest the foregoing in good faith.

5.    Remedies on Default.

5.1.    In addition to any and all rights Lenders shall have under the Loan Documents or otherwise by law for a default or breach of the obligations of the Company under the Loan Documents (any such event being herein called a "Default"), Agent on behalf of Lenders shall have the rights and remedies of a secured party under the UCC.

5.2.    Subject to applicable law, Agent's notice of the time and place of public sale of the Collateral, or the time on or after which a private sale or other disposition of the Collateral will be made, is reasonable if sent to the Company in the manner for giving notice at least ten (10) business days before the public or private sale.

5.3.    The Company must accurately and regularly account for the Collateral and reflect it in all records and make all records relating to it available to Agent on behalf of Lenders and their agents and representatives.

5.4.    Any assignment, sale, foreclosure, or levy made under this Section 5 shall divest the Company of all right, title, and claim it may have in and to the Collateral.

6.    No Encumbrance.  While the Loan Documents are in effect, the Company shall not transfer, sell, or otherwise dispose of the Collateral or take any action that may, in any way, adversely effect the rights of Lenders with respect to the Collateral without the Agent's prior written consent, which consent shall may be granted or withheld in Agent's sole discretion.

7.    No Waiver by Lender.  No failure by Agent on behalf of Lenders to exercise, and no delay in exercising, any right, remedy or power under this Agreement shall operate as a waiver, nor shall any single or partial exercise by Agent on behalf of Lenders of any right, remedy or power hereunder preclude any other or future exercise.  Each right, remedy, or power granted to Agent on behalf Lenders or allowed them by law or other agreement shall be cumulative and not exclusive of any other, and may be exercised from time to time.

8.    No Obligations or Duties of Lenders. Agent shall be under no duty or obligation to make or give any presentments, demands for performance, notices of nonperformance, protests, notices of protest or notices of dishonor in connection with Collateral, except as required under the UCC.

9.    <u>Governing Law and Venue.</u>  This Agreement shall be governed by and construed in accordance with the laws of the State of California (without regard to conflict of laws principles). Each of the parties hereto agrees that any action or proceeding against it arising out of or in connection with this Agreement may be commenced and maintained in any state or federal court within San Diego, California and that the state and federal courts of the State of California shall have exclusive jurisdiction with respect to the subject matter hereof and the parties hereto.

10.    <u>Counterparts.</u>  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one instrument.  Any of the parties hereto may execute this Agreement by signing any such counterpart.

11.    <u>Successors and Assigns.</u>  This Agreement shall bind and inure to the benefit of the parties and their respective successors and assigns.

12.    <u>Notices.</u>  Each notice and other communication required or permitted to be given under this Agreement ("Notice") must be in writing.  Notice is duly given to another party upon:  (a) hand delivery to the other party, (b) receipt by the other party when sent by facsimile to the address and number for such party set forth at the end of this Agreement (provided, however, that the Notice is not effective unless a duplicate copy of the facsimile Notice is promptly given by one of the other methods permitted under this Section), (c) three (3) business days after the Notice has been deposited with the United States postal service as first class certified mail, return receipt requested, postage prepaid, and addressed to the party at the address for such party set forth at the end of this Agreement, or (d) the next business day after the Notice has been deposited with a reputable overnight delivery service, postage prepaid, addressed to the party at the address for such party set forth at the end of this Agreement with next-business-day delivery guaranteed, provided that the sending party receives a confirmation of delivery from the delivery-service-provider.  Each party shall make a reasonable, good faith effort to ensure that it will accept or receive Notices to it that are given in accordance with this Section.  A party may change its address for purposes of this Section by giving the other party written notice of a new address in the manner set forth above.

13.    <u>Severability.</u>  If any provision of this Agreement is declared void by a judicial or quasi judicial tribunal, such provision shall be deemed severed from this Agreement, which shall otherwise remain in full force and effect.

14.    <u>Interpretation.</u>  This Agreement shall be interpreted in a reasonable manner to effect the purposes of the parties and this Agreement.  Each party has been afforded the right to be represented by independent counsel and hereby waives any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the party drafting it.

15.    <u>Attorney's Fees.</u>  The prevailing party(ies) in any litigation, arbitration, mediation, bankruptcy, insolvency or other proceeding ("Proceeding") relating to the enforcement or interpretation of this Agreement may recover from the unsuccessful party(ies) all costs, expenses, and actual attorney's fees (including expert witness and other consultants' fees and costs) relating to or arising out of (a) the Proceeding (whether or not the Proceeding proceeds to judgment), and (b) any post-judgment or post-award proceeding including, without limitation, one to enforce or collect any judgment or award resulting from the Proceeding.  All such judgments and awards shall contain a specific provision for the recovery of all such subsequently incurred costs, expenses, and actual attorney's fees.

16.    <u>Entire Agreement.</u> The Loan Documents, and any other agreements and instruments referred to herein, contain the entire agreement of the parties with respect to the subject matter hereof, and may be amended only by an agreement in writing signed by the parties.

*[Signatures on Following Page]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**The Company:**                          **Agent:**

PHAGE BIOTECHNOLOGY
CORPORATION

By:_____          By:_____
Name: _____              Richard Ritter
Title: _____

# EXHIBIT A
## INTELLECTUAL PROPERTY

## LENDERS RIGHTS AGREEMENT

This Lenders Rights Agreement (this "Agreement") is entered into to be effective as of _____, 2008 (the "Effective Date"), by and among the undersigned lenders, (the "Lenders" or, individually, a "Lender"), Richard Ritter ("Ritter") as the initial collateral agent for the benefit of Lenders, and Phage Biotechnology Corporation, a Delaware corporation (the "Company") as follows.

1.    Recitals.

1.1.    Each Lender has or will loan sums to the Company pursuant to the terms of a loan agreement (the "Loan Agreement") among the Company and each Lender. Each Lender's loan is reflected by a Secured Convertible Promissory Note (the "Note(s)").

1.2.    The Company has agreed that the loans represented by the Notes shall be secured by the assets of the Company in accordance with the terms of a security agreement between the Company and the Lenders (the "Security Agreement"). By this Lenders Rights Agreement, each Lender agrees to appoint Ritter or such other person selected by a Majority Interest as successor to Ritter if he is unable for any reason to act as collateral agent pursuant to the terms of this Agreement ("Agent") as such Lenders' agent and attorney-in-fact with the right and authority to enforce certain of the Lender's rights under the Lender's Note, the Loan Agreement and the Security Agreement.

1.3    The Loan Agreement, Notes and Security Agreement, together with this Agreement, are collectively referred to as the "Loan Documents."

2.    Definitions

2.1    Generally.    Words and phrases having their initial letters capitalized in this Agreement shall have the meaning set forth herein. All capitalized terms not specifically defined in this Agreement have the meaning ascribed to them in the Security Agreement, Note, or Loan Agreement, as applicable. In the event of any conflict between this Agreement and the Notes, Security Agreement, or Loan Agreement, the Loan Agreement shall control.

2.2    Additional Definitions

"Agency Period" means the period of time commencing on the Effective Date and continuing until (a) the security interest created pursuant to the Security Agreement has been terminated or released as a result of the Notes being fully paid or converted into capital stock or any other security of the Company in accordance with the terms of the Notes; (b) the foreclosure and disposition of Collateral being completed; (c) as otherwise agreed in writing by Agent and a Majority Interest of the Notes.

"Agent" means the person appointed pursuant to the terms and provisions of this Agreement as agent for the Lenders to exercise the rights under the Notes and Security Agreement, or his, her or its successor. Initially, Ritter shall be the Agent.

"Majority Interest" means a majority in interest of the Notes by dollar amount of principal and accrued interest of the Notes outstanding.

3.    Appointment of Agent

3.1    After Default.  The Lenders, and each of them, hereby appoint Ritter as Agent following an Event of Default (defined in Section 5.1) as their agent and attorney-in fact to (a) exercise all of the Lenders' rights to collect the indebtedness represented by, and to enforce the Company's obligations under the Loan Documents pursuant to the terms of this Agreement; and (b) enforce and exercise all of Lenders' rights under the Security Agreement.

3.2    After Payment or Conversion. The Lenders, and each of them, hereby appoint Ritter as Agent as their agent and attorney-in fact to execute and deliver proper instruments  following payment or conversion of the Notes (a) acknowledging satisfaction of the Notes which have been paid or converted and (b) releasing any security interest which may have attached pursuant to the terms of the Security Agreement.

3.3    Nature of Agency.  The powers of attorney and agencies when created pursuant to Sections 3.1 and 3.2 are each irrevocable and coupled with an interest. In exercising the rights set forth in this Agreement, Agent shall have the same power and authority as an owner of the economic interests underlying the Notes and Security Agreement possessed by Lenders. The appointments under Section 3.1 and 3.2, respectively, shall commence on the Effective Date and shall continue until the termination of the Agency Period. The appointment hereunder shall be binding upon the successors and assigns of the parties, and shall survive the death, disability or loss of legal capacity of each Lender.  Lenders reserve, and the appointment does not include the right, power or authority to convert all or any part of the principal or accrued interest of the Notes to capital stock or any other security of the Company.

4.    Termination of Agency Period.  At the termination of the Agency Period, all the rights and obligations of the Agent with respect to (a) the converted Notes in the case of payment or conversion of the Notes and (b) the Security Agreement shall thereupon cease. Despite the termination of the Agency Period, Lenders' obligations to Agent pursuant to Section 6.6 shall continue in full force and effect.

5.    Remedies

5.1    Acceleration of Maturity.   If an Event of Default (as defined in the Loan Agreement) occurs and cure thereof has not been effected within the time period provided, if any, then the Agent shall declare the principal of the Notes to be due and payable immediately by delivery of notice in writing to the Company, and upon any such declaration such principal and any accrued and unpaid interest shall become immediately due and payable.

At any time after such a declaration of acceleration has been made and before (i) a judgment or decree for payment of the money due has been obtained by the Agent as provided in this Article or (ii) a sale has been consummated pursuant to the powers contained in the Security Agreement, the holders of at least a Majority Interest, by written notice to the Company and the Agent, may rescind and annul such declaration of acceleration and its consequences if all Events of Default, other than the non-payment of the principal of the Notes which has become due solely by such acceleration, have been cured or waived and the Company has paid or deposited with the Agent a sum sufficient to pay:

a.      All overdue installments of interest payable pursuant to the Notes;

b.      The principal of the Notes which has become due otherwise than by such declaration of acceleration and interest thereon at the rate set forth in the Notes;

c.      To the extent that payment of such interest is lawful, interest upon overdue installments of interest at the rate set forth in the Notes; and

d.      All sums paid or advanced by the Agent hereunder and the reasonable compensation, expenses, disbursements and advances of the Agent.

Without regard to the foregoing conditions, such declaration of acceleration hereunder shall be rescinded and annulled automatically and without further action by the Agent or Lenders whenever a declaration of acceleration under this Agreement is rescinded or annulled. No such rescission shall affect any subsequent default or impair any right consequent thereon.

5.3     Collection of Indebtedness and Suits for Enforcement by Agent.  The Company and Lenders agree that if an Event of Default (as defined in the Loan Agreement) occurs, holders of at least a Majority Interest may direct the Agent in writing: (i) to institute a judicial proceeding for the collection of the sums so due and unpaid, to prosecute such proceeding to judgment or final decree, to enforce the same against the Company or any other obligor upon the Notes and to collect the monies adjudged or decreed to be payable in the manner provided by law out of the property of the Company; (ii) to proceed to exercise the remedies permitted under the terms of the Security Agreement; (iii) compromise, settle, or modify the Notes, including acceptance of a lesser amount due under the Notes and all obligations thereunder subject to the approval of the holders of at least a Majority Interest; or (iv) to take such other action as may be directed by the holders of at least a Majority Interest.

5.4     Application of Money Collected.  All money collected by the Agent pursuant to this Article, together with any other security, shall be applied in the following order, on the date or dates fixed by the Agents and, in case of the distribution of such money on account of principal or interest, upon presentation of the Notes and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid:

5.4.1   First, to the payment of all amounts due to the Agent hereunder;

5.4.2   Second, to the amount due and unpaid under the Notes, and interest with respect to, or for the benefit of, which such money has been collected, without preference or priority of any kind; and

5.4.3   Third, to the payment of the remainder, if any, to the Company, its successors or assigns or to whosoever may lawfully be entitled to receive the same or as a court of competent jurisdiction may direct.

5.5     Limitation on Suits.  During the Agency Period, Lenders shall not have any right to institute any proceeding, judicial or otherwise, with respect to the Loan Documents, or for the appointment of a receiver or Agent, or for any remedy hereunder, unless:

5.5.1   Such Lender shall previously have given written notice to the Agent of a continuing Event of Default;

5.5.2   The Lender or holders of at least a Majority Interest shall have made written request to the Agent to institute proceedings with respect to such Event of Default hereunder;

5.5.3   The Lender or holders of at least a Majority Interest have offered the Agent reasonable indemnity against the costs, expenses and liability to be incurred in compliance with such request;

5.5.4   The Agent, for thirty (30) days after its receipt of such written request and offer of indemnity, has failed to institute any such proceedings; and

5.5.5   No direction inconsistent with such written request has been given to the Agent during such sixty (60) day period by the Lender or holders of at least a Majority Interest, it being understood and intended that no one or more Lenders shall have any right in any manner whatsoever, by virtue of, or by availing itself of, any provision of this Agreement to affect, disturb or prejudice the rights of any other Lenders or to obtain or seek to obtain priority or preferences over any other Lenders or to enforce any right under this Agreement, excepting the manner provided herein and for the equal and ratable benefit of all Lenders.

5.6   <u>Rights and Remedies Cumulative</u>.  No remedy herein conferred upon or reserved to the Agent or the Lenders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing a law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder or otherwise shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

5.7   <u>Delay or Omission Not Waiver</u>.  No delay or omission by the Agent or by any Lenders to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Section 5 or by law to the Agent or to the Lenders may be exercised from time to time, and as often as may be deemed expedient, by the Agent or by the Lenders, as the case may be.

5.8   <u>Undertaking for Costs</u>.  All parties to this Agreement agree, and each Lender, or subsequent Lender by his acceptance of the beneficial interest of a Lender hereof, shall be deemed to have agreed that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Agreement or in any suit against the Agent for any action taken or omitted by them as Agent, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in any such suit.

6.   <u>Agent</u>.

6.1   <u>Reliance; Authority; Lack of Duty to Act Without Discretion</u>.  Any person other than a Lender, the Agent, or the Company may conclusively rely on any action or direction of Agent

as properly authorized hereunder. The Agent shall not be required to compromise, contest or arbitrate claims or demands, or to commence or defend any action at law or equity or any other proceedings brought or instituted by persons other than parties to the instrument affecting or with respect to this instrument; provided however, that upon the written request of holders of at least a Majority Interest, accompanied by money and/or indemnity sufficient in the sole judgment of the Agent to cover all costs, damages and liabilities in connection therewith, the Agent may do and perform any or all of the foregoing acts, in which event he or she shall have all the powers, rights and discretions which are necessary for his or her compliance with such request, including the right to employ such counsel and agents as the Agent shall deem advisable, all at the risk and expense of the Lenders. With respect to the foregoing, the Agent shall employ the counsel and/or agents, if any, specified by the holders of at least a Majority Interest in such request, if the same are reasonably acceptable to Agent.

6.2    Involuntary Action. In any event, if the Agent is involuntarily made a party to any action or proceeding, the Agent shall, upon being served with process, give written notice thereof to the Lenders and, if within five (5) days thereafter, the Lenders do not undertake its defense without expense or liability on the part of the Agent, then the Agent shall take such action as he, she or it shall deem necessary and proper under the circumstances, appoint such counsel as the Agent deems advisable and advance the Agent's own funds for the payment of expenses in connection therewith, all at the risk and expense of the Lenders.

6.3    Judicial Relief. If the Agent is involuntarily made a party to an action or is required to act in a manner which the Agent reasonably concludes is not herein authorized or which will expose the Agent to liability, the Agent shall be entitled to interplead, or otherwise seek judicial relief as the Agent in his, her or its discretion deems appropriate, all at the expense of the Lenders and any other party to such matter or any event as may be determined by a court of competent jurisdiction. In the alternative, the Agent shall have in his, her or its sole discretion the right to withhold and stop all further performance under this Agreement until the Agent receives written proof to his, her or its satisfaction of the settlement of the controversy or the entry of final judgment by a court of competent jurisdiction. Lenders agree to pay promptly on demand as well as to indemnify and hold the Agent harmless from and against all litigation costs, damages, judgments, attorneys' fees, expenses, obligations and liabilities.

6.4    Limitations on Directions. Any and all acts required of the Agent in accordance with the written directions of any party shall be subject to the following limitations:

6.4.1    The terms and conditions of any instrument to be executed by the Agent and the form and substance of content of the same shall be the sole responsibility of the directing party, it being expressly understood that the Agent assumes no responsibility with respect to the sufficiency of such instrument.

6.4.2    The Agent reserves the right to qualify his, her or its execution of any instrument or document so as to (a) limit the Agent's undertaking to his, her or its fiduciary office and (b) evidence a restriction on the Agent's liability, in all cases, to the total amount of the Notes.

6.4.3    In the event the Agent executes any instrument as "Agent," or is designated as such thereunder, the Agent may disclose the existence of the fiduciary office to such persons and/or entities as the Agent may reasonably determine is necessary under the circumstances relative

to the issuance of disclosure as may from time to time exist.

6.5    Notice.  Within ten (10) days after receipt of any notice hereunder, the Agent shall transmit such notice by mail to all Lenders registered at the names and addresses as last noticed to the Agent.

6.6    Compensation and Reimbursement.  The Company agrees:

6.6.1    Except as otherwise expressly provided herein, to reimburse the Agent upon his, her or its request for all reasonable expenses, disbursements and advances incurred or made by the Agent in accordance with any provision of this Agreement (including the reasonable compensation and the expenses and disbursements of Agent's counsel), except any such expense, disbursement or advance as may be attributable to the Agent's gross negligence or bad faith; and

6.6.2    To indemnify the Agent for, and to hold Agent harmless against, any loss, liability, or expense incurred without gross negligence or bad faith on the Agent's part and arising out of or in connection with the acceptance or administration of this Agreement, including the costs and expenses incurred by the Agent in defending against any claim (valid or invalid) or liability in connection with the exercise or performance of any of his, her or its powers or duties hereunder.

6.7    Removal, Resignation or Change of Agent.  The Agent hereunder may resign, effective at the expiration of thirty (30) days prior notice to all Lenders.  Prior to the Agent's resignation, the holders of at least a Majority Interest shall designate a successor.

7.    Covenants of The Company.  The Company shall duly and punctually pay the principal of and interest on the Notes in accordance with the terms of the Loan Documents.  The Company will pay interest (to the extent enforceable under applicable law) on any overdue installments of principal or interest at the same rate as stated in the Notes.

8.    General

8.1    Binding Effect.  The provisions hereof shall inure to and bind the Agent, the Company, the Lenders and all of their successors and assigns.

8.2    Events.  Until the Agent shall receive from some person interested in this Agreement written notice of any event upon which the right to payments hereunder may depend, the Agent shall incur no liability to persons or entities whose interests may have been affected by that event for disbursements made in good faith.

8.3    Successor.  Any successor to the Agent shall succeed to all powers, rights, discretions, obligations and immunities of the Agent hereunder, with the same effect as though such successor were originally named herein as Agent.  Every successor Agent shall have all the powers given the originally named Agent.  No successor Agent shall be personally liable for any act or omission of any predecessor.

8.4    Entire Agreement.  This Agreement, together with the documents and instruments referred to herein, contains the entire agreement of the parties hereto with respect to the subject matter hereof, and supersedes any prior written or oral agreements between them.  There are no

representations, agreements, arrangements or understandings, oral or written, between the parties hereto relating to the subject matter contained in this Agreement which are not fully expressed herein. The provisions of this Agreement may be waived, amended or repealed in whole or in part only upon the written consent of all parties to this Agreement, except as otherwise provided herein.

      8.5    <u>Attorneys' Fees</u>. In the event of any litigation concerning any controversy, claim or dispute between the parties hereto, relating to this Agreement or the breach or interpretation hereof, the prevailing party(ies) shall be entitled to recover from the losing party(ies) reasonable expenses, attorneys' fees and costs incurred therein or in the enforcement or collection of a judgment or award rendered therein. The "prevailing party(ies)" means the party(ies) determined by the court to have most nearly prevailed, even if such party(ies) did not prevail in all matters, not necessarily the one in whose favor a judgment is rendered. In the event of a default by a party(ies) hereunder, such defaulting party(ies) shall pay all expenses and attorneys' fees incurred by the other party(ies) in connection therewith, whether or not any litigation commenced.

      8.6    <u>Notices.</u>  Each notice and other communication required or permitted to be given under this Agreement ("Notice") must be in writing. Notice is duly given to another party upon: (a) hand delivery to the other party, (b) receipt by the other party when sent by facsimile to the address and number for such party set forth at the end of this Agreement (provided, however, that the Notice is not effective unless a duplicate copy of the facsimile Notice is promptly given by one of the other methods permitted under this Section), (c) three (3) business days after the Notice has been deposited with the United States postal service as first class certified mail, return receipt requested, postage prepaid, and addressed to the party at the address for such party set forth at the end of this Agreement, or (d) the next business day after the Notice has been deposited with a reputable overnight delivery service, postage prepaid, addressed to the party at the address for such party set forth at the end of this Agreement with next-business-day delivery guaranteed, provided that the sending party receives a confirmation of delivery from the delivery-service-provider. Each party shall make a reasonable, good faith effort to ensure that it will accept or receive Notices to it that are given in accordance with this Section. A party may change its address for purposes of this Section by giving the other party written notice of a new address in the manner set forth above.

      8.7    <u>Further Assurances; Counterparts</u>. The Company and each Lender agree to execute such additional documents and amendments to this Agreement as any party hereto may reasonably request to effect the purpose set forth herein. This Agreement may be executed in counterparts, and the signature page of each such counterpart, when attached to the original Agreement, shall be deemed a single agreement.

      8.8    <u>Exhibits</u>. All exhibits referred to in this Agreement are attached to this Agreement and incorporated by reference.

      8.9    <u>Interpretation</u>. This Agreement has been negotiated at arm's length and each party has had the opportunity to be represented by independent legal counsel in this transaction. Any rule of law (including without limitation § 1654 of the California Civil Code) or legal decision that would require interpretation of any ambiguities in this Agreement against the party drafting such document is not applicable and is hereby waived. Wherever the context of this Agreement requires, all words used in the singular shall be construed to have been used in the plural, and vice versa, and the use of any gender specific pronoun shall include any other appropriate gender. The term "person" shall refer to any individual, corporation or legal entity having standing to bring an action in its own name.

The conjunctive "or" shall mean "and/or" unless the context otherwise requires. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the purposes of the parties and this Agreement.

8.10   <u>Governing Law and Venue.</u>  This Agreement shall be governed by and construed in accordance with the laws of the State of California (without regard to conflict of laws principles). Each of the parties hereto agrees that any action or proceeding against it arising out of or in connection with this Agreement may be commenced and maintained in any state or federal court within San Diego, California and that the state and federal courts of the State of California shall have exclusive jurisdiction with respect to the subject matter hereof and the parties hereto.

WHEREFORE, the parties hereto have executed this Agreement as of the Effective Date.

*SIGNATURE PAGE FOLLOWS*

**Company**:

Phage Biotechnology Corporation,
a Delaware corporation

By:_____
Name: _____
Its: _____

Address: _____

_____

_____

**Agent:**

_____

Richard Ritter

Address: _____

_____

_____

**Lenders**:

_____

Signature: _____
Name:_____
Address: _____

_____

_____

Signature:_____
Name:_____
Address: _____

_____

_____

Signature: _____
Name:_____
Address: _____

_____

_____

Signature:_____
Name:_____
Address: _____

_____

# EXHIBIT "B"

# Phage Biotechnology Corporation
**Short Term Cash Flow**
Prepared October 30, 2008

*Assumes an Effective 11 date of 10-28-08*

| | Pre - Pet. | | | | Post Petition | | | |
|---|---|---|---|---|---|---|---|---|
| | *Estimate* | *Estimate* | *Estimate* | *Estimate* | *Estimate* | *Estimate* | *Estimate* | *Estimate* |
| Week Ending: | 10/24/2008 | 10/31/2008 | 11/7/2008 | 11/14/2008 | 11/21/2008 | 11/28/2008 | 12/5/2008 | 12/12/2008 |
| **Beginning Cash** | 2,682 | 2,682 | 192,682 | 34,132 | 95,282 | 53,782 | 110,032 | 58,582 |
| *Cash Receipts* | | | | | | | | |
| DIP Financing | | 200,000 | | 150,000 | | 150,000 | | |
| Cash Available | 2,682 | 202,682 | 192,682 | 184,132 | 95,282 | 203,782 | 110,032 | 58,582 |
| **Personnel and related costs** | | | | | | | | |
| Payroll | | | 30,000 | | 30,000 | | 30,000 | |
| Employer Medical Payments/benefits | | | | 3,850 | | | 4,950 | |
| Consultants | | | 32,000 | | | 30,000 | | |
| **Mfg Op's, non-personnel costs** | | | | | | | | |
| Mfg Rent | | | 25,300 | | | 23,000 | | |
| Utilities | | | 8,000 | | | | | |
| Mfg supplies | | 5,000 | 10,000 | 30,000 | 5,000 | 5,000 | 6,500 | 5,000 |
| Travel | | 2,500 | 1,500 | 5,500 | 4,000 | 2,500 | 5,000 | 1,500 |
| Misc | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| **BS Biology R&D Contract** | | | | | | | | |
| BS Kiev | | | | 12,000 | | | | 12,000 |
| **Corporate Insurance, Legal, and IP** | | | | | | | | |
| GL Insurance and W/C Policy | | | | | | 5,000 | | |
| Legal | | | 25,000 | 35,000 | | 25,000 | | |
| Intellectual Property | | | 6,000 | | | | | 4,000 |
| **San Diego R&D Lab move** | | | | | | | | |
| R&D Rent | | | 10,000 | | | | | |
| Move Costs Lab | | | 7,500 | | | | | |
| Storage Costs | | | 750 | | | 750 | | |
| Total Disbursements | 0 | 10,000 | 158,550 | 88,850 | 41,500 | 93,750 | 51,450 | 25,000 |
| **Ending Cash** | 2,682 | 192,682 | 34,132 | 95,282 | 53,782 | 110,032 | 58,582 | 33,582 |

62

**CERTIFICATE OF SERVICE**

I, Viann Corbin, declare as follows:

I am employed in the County of Orange, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 660 Newport Center Drive, 4th Floor, Newport Beach, California 92660, in said County and State.  On November 4, 2008 I served the following document: **DEBTOR'S EMERGENCY MOTION FOR ORDER APPROVING DEBTOR-IN-POSSESSION LOAN; DECLARATIONS IN SUPPORT THEREOF** on each of the interested parties stated on the attached service list:

| **Fax: 619.557.5339** |
| :---: |
| U.S. Trustee's Office |
| David Ortiz, Esq. |
| 402 W. Broadway, Suite 600 |
| San Diego, CA 92101-8511 |

by the following means of service:

☐    **BY ELECTRONIC MAIL:** On the date set forth above, from Newport Beach, California, I caused each such document to be transmitted electronically to the parties at the e-mail address indicated.  To the best of my knowledge, the transmission was reported as complete, and no error was reported that the electronic transmission was not completed.  A return receipt was requested at the time of the transmission of each such document and I did not receive a notice of failure of receipt of each such document.

☒    **BY FACSIMILE**: On the date set forth above, from Newport Beach, California, I caused each such document to be transmitted by facsimile machine, to the parties and numbers indicated above.  To the best of my knowledge, the transmission was reported as complete, and no error was reported by the facsimile machine.  A copy of the transmission record is maintained by our office.

☒    I am employed in the office of Winthrop Couchot Professional Corporation; Marc J. Winthrop is a member of the bar of this court.

☐    **(STATE)**    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☒    **(FEDERAL)**    I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 4, 2008.

Viann Corbin

-19-