MARC J. WINTHROP – State Bar No. 63218
mwinthrop@winthopcouchot.com
SAMIR D. PARIKH – State Bar No. 224777
sparikh@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone:  (949) 720-4100
Facsimile:  (949) 720-4111

General Insolvency Counsel
for Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>PHAGE BIOTECHNOLOGY CORP.,<br>a Delaware corporation,<br><br>        Debtor and<br>        Debtor-in-Possession. | Case No. 08-09859-LA11<br><br>Chapter 11 Proceeding<br><br>**DEBTOR'S MOTION FOR ORDER (1) APPROVING OVERBID PROCEDURES AND BREAK-UP FEE IN CONNECTION WITH PROPOSED SALE OF SUBSTANTIALLY ALL ASSETS OF THE ESTATE, AND (2) SETTING HEARING ON MOTION FOR SALE OF SUBSTANTIALLY ALL ASSETS OF ESTATE; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DR. THOMAS J. STEGMANN IN SUPPORT THEREOF**<br><br>[Local Bankruptcy Rule 6004-1]<br><br>DATE:      February __, 2010<br>TIME:      _____ __.M.<br>PLACE:   Department 2, Room 118<br>               325 West F Street<br>               San Diego, CA 92101 |

**TO THE HONORABLE LOUISE DECARL ADLER, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; CREDITORS; AND PARTIES-IN-INTEREST:**

**PLEASE TAKE NOTICE** that, pursuant to Local Bankruptcy Rule 6004-1, Phage Biotechnology Corporation, the debtor and debtor-in-possession herein (the "Debtor"), hereby moves for an order approving overbid procedures and break-up fee (the "Procedures Motion"), and setting a hearing on a motion for approval of the sale of substantially all assets of the Debtor's estate (collectively, the "Assets") pursuant to sections 363 and 365 of the Bankruptcy Code (the "Sale Motion"). Debtor proposes to sell the Assets to New Technologies Holding Pte. Ltd., a limited private company organized under the laws of the Republic of Singapore ("New Technologies") and/or one or more entities established by New Technologies for the purpose of purchasing the Assets (collectively, the "Buyer"), pursuant to the following: (i) $2,000,000 in the form of a reduction and satisfaction of an equivalent amount of the various debtor in possession financing obligations Debtor has to Buyer (any and all such loans and debts outstanding at any time, including principal, accrued interest and fees, hereinafter referred to as the "DIP Loan"); (ii) the assumption of the DIP Loan in excess of $2,000,000 (and, in the event Buyer, subject to further agreement(s) with Debtor and subject to Court approval, is requested to and elects to provide additional financing to Debtor, such additional financing (the "Overadvance"); provided, however, in the absence of any Overadvance and to the extent the DIP Loan at Closing is less than $2,500,000, Buyer shall pay to Debtor in cash the difference between the DIP Loan and $2,500,000; and (iii) shares of the Common Stock of Buyer constituting ten (10%) percent of the fully-diluted post-Closing equity of Buyer (the "Equity Shares"); provided, however, that (a) to the extent the DIP Loan exceeds $2,500,000 and/or (b) if any Overadvance exists, the Equity Shares shall be reduced by ten (10%) percent for each $20,000 increment of the aggregate total amount that the DIP Loan and, if applicable, the Overadvance exceed $2,500,000.

In order to maximize value in this case, Debtor seeks to auction the Assets. In order to ensure a fair and efficient auction, Debtor seeks to establish uniform overbid procedures with which all interested parties must comply in order to purchase Debtor's Assets.

1    This Procedures Motion is based upon the Memorandum of Points and Authorities set

2  forth herein below, the declaration of Dr. Thomas J. Stegmann ("Stegmann Declaration")

3  appended hereto, all pleadings, papers and records on file with the Court, and such other evidence,

4  oral or documentary, as may be presented to the Court at the hearing on the Procedures Motion.

5    WHEREFORE, Debtor prays that the Court enter an order approving the proposed overbid

6  procedures and break-up fee, and setting a hearing on the Sale Motion, and such additional relief

7  as the Court deems just and proper.

8  DATED:  February 22, 2010    **WINTHROP COUCHOT**
                                   **PROFESSIONAL CORPORATION**
9

10                                By:___/s/ Marc J. Winthrop_____
                                       Marc J. Winthrop
11                                     Samir D. Parikh
                                   General Insolvency Counsel for Debtor and
12                                 Debtor-in-Possession

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#140202-v4-Phage_(Motion_Seeking_Approval_of_Bid_Procedures)

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

From the outset of this case, the ability of Phage Biotechnology Corporation, the debtor and debtor-in-possession herein ("Debtor"), to reorganize its financial affairs in Chapter 11 has been dependent upon, among other things, access to cash to enable Debtor to pursue U.S. Food and Drug Administration ("FDA") approval of its bio-generic and proprietary drug portfolio. Unfortunately, Debtor has been unable to obtain the requisite amount of financing it believes is necessary to pursue its business strategy. Moreover, Debtor's ability to generate profits is hampered by the significant administrative costs associated with the bankruptcy and the negative effect on sales resulting from the stigma associated with operating as a debtor-in-possession.

Fortunately, through Debtor's pre-petition and post-petition marketing efforts, Debtor has identified a strategic buyer who has proposed to purchase substantially all its assets ("Assets") for an amount greater than liquidation value, which would maximize the return to creditors. Based on Debtor's current financial condition, the weak economy, and the lack of offers received for the Assets, Debtor believes that a prompt sale of Debtor's Assets is necessary to maximize value and recovery to creditors. Debtor has been seeking a buyer or financial partner since October 2008. A list of all contacts/companies that were contacted appears as Exhibit A to the Declaration of Dr. Thomas J. Stegmann, filed herewith.

While the specific amount of the proposed bid submitted by Buyer cannot be precisely determined at this time (though estimated to be not less than $2,700,000), based on the structure of the proposal, the proposed bid clearly provides substantially more value than would be realized in a liquidation sale. In order to preserve the bid and value for the estate, the Sale Motion should be heard as soon as possible. Moreover, Debtor's cash resources and DIP Loan availability will likely be substantially exhausted by March 30, 2010.

Debtor hereby submits that court-approved uniform sale and bidding procedures and guidelines, which can be described more fully in the Sale Motion, will lead to an orderly sale at

1    the hearing thereon.  In this regard, Debtor respectfully submits that it is necessary to obtain a

2    Court order approving the proposed overbid procedures and break-up fee as soon as possible to

3    include in the court-approved sale and overbid procedures in the Sale Motion.

4                                              **II.**

5                            **GENERAL BACKGROUND FACTS**

6            A summary of the background of Debtor, including a description of Debtor's operations

7    and financial difficulties which ultimately led to Debtor's Chapter 11 filing, follows

8    immediately hereinbelow.

9            **A.      General Background.**

10          Debtor is in the business of developing and commercializing an efficient method of

11   manufacturing bio-pharmaceuticals with its proprietary technology.  On October 2, 2008, certain

12   creditors commenced an involuntary Chapter 7 case against Debtor (the "Petition Date").  On

13   October 28, 2008, the Court entered an order for relief converting this case into a voluntary

14   Chapter 11 case.

15          Debtor is a Delaware corporation with its corporate office and operating facilities located

16   in San Diego, California.  Debtor currently employs 11 people, including part time employees

17   and consultants of various kinds.   From Debtor's inception until October 7, 2008, Debtor's

18   Chairman, President, and CEO was Daniel Montano ("Montano").  Mr. Montano resigned from

19   all positions with Debtor on or about October 7, 2008.  Debtor's current CEO is Dr. Thomas J.

20   Stegmann.

21          **B.      Debtor's Business.**

22          Debtor was founded in 1998 to commercialize an efficient method of manufacturing bio-

23   pharmaceuticals that were invented by a group of Ukrainian scientists.  As a development stage

24   company which is still not generating significant revenue, Debtor depends significantly on

25   external funding for survival and progress.  A majority of the external funding provided to

26   Debtor prior to the Petition Date came from the holders (the "Noteholders") of Debtor's

27   promissory notes (the "Notes").  Debtor's promissory notes were issued at various dates from

28   2001 through to 2004 with a three-year maturity date.  Debtor raised a total of approximately

1   $16,700,000 in the period from 2001 to 2005 from two series of convertible promissory notes.

2   Series I totaled approximately $11,600,000 principal with 233 Noteholders and Series II totaled

3   approximately $5,100,000 of principal with 20 Noteholders.  The principal and accrued interest

4   of these Notes now total approximately $23,500,000, or approximately 75% of Debtor's total

5   debt. The corporate books of record of Debtor are unaudited.

6           Debtor has a contractual relationship with Phage Biotech Ukraine LLC, located in Kiev,

7   Ukraine ("Phage Ukraine"), which employs a research team and supports the San Diego

8   manufacturing facility.  Substantially all of Debtor's original intellectual property was sourced

9   from Phage Ukraine.

10          Debtor's intellectual property includes numerous U.S. patents and related foreign patent

11  approvals in European countries with large markets for Debtor's drugs.  In Japan, three of

12  Debtor's U.S. Patents are currently being examined.

13          Debtor's main route to commercialization and profitability has always been to seek

14  further revenue generating activities for its licensed San Diego manufacturing facility, and to

15  gain FDA approval for its bio-generic and proprietary drug portfolio to be manufactured by the

16  Phage process.  At present two compounds are in FDA clinical trials:  Phage's Human Growth

17  Hormone ("HGH"), and Phage's Fibroblast Growth Factor 1 ("FGF-1").

18      **C.    Events Precipitating This Chapter 11 Filing.**

19           Debtor's financial problems and the consequent need to file this bankruptcy proceeding

20  were primarily caused by a variety of factors.  As a start-up company, Debtor has minimal

21  income and thus needs infusions of outside capital in order to fund its operations of developing

22  and commercializing its intellectual property.  From 1998 to 2008, Debtor raised net capital

23  proceeds of approximately $24,500,000 from common and preferred stock, and note and loan

24  financing.  However, from late summer 2005 until summer of 2008, Debtor only raised net

25  proceeds of approximately $6,000,000 of outside capital which was grossly inadequate in

26  relation to Debtor's needs, maturing Note obligations, and the scale of its opportunity.  This

27  failure to raise sufficient capital in the last several years led to Debtor defaulting on its Note

28  obligations, as well as obligations to other creditors.

### D.      Disclosure Regarding Buyer

New Technologies Holding Pte. Ltd. ("Buyer") is a limited private company organized under the laws of the Republic of Singapore. Messrs. Frederic Chanson and Richard Ritter, who currently sit on Debtor's Board of Directors and are participants in the DIP Loan, are associated with Buyer.

### E.      Marketing Efforts

Debtor has been actively marketing itself for investment or sale since October 2008. Since the filing, Debtor has redoubled its efforts and has been actively seeking an investor to infuse capital into Debtor to file a plan of reorganization. Debtor has been in regular contact with the creditors' committee to report on the status of these efforts, which, to date, have yielded no results.

### F.      U.S. Trustee's Motion to Dismiss or Convert

On December 10, 2009, the United States Trustee ("UST") filed a Motion to Dismiss or Convert the Case to One Under Chapter 7 (the "Motion to Dismiss"). The Motion to Dismiss was originally scheduled to be heard on January 14, 2010. On December 23, 2010, this Court entered an Order approving a stipulation between the UST and the Debtor that continued the hearing to March 4, 2010. On February 18, 2010, the Debtor filed the Debtor's Opposition to United States Trustee's Motion to Dismiss or Convert the Case to One Under Chapter 7, in which the Debtor explained that, subsequent to the filing of the Motion to Dismiss, the Debtor received the term sheet from the Buyer to purchase the Assets.

### III.

### THE PROPOSED SALE OF THE ASSETS OF DEBTOR

Debtor believes that a very prompt sale of its Assets will maximize value for Debtor's estate case. The alternative to an orderly sale will, under the circumstances, and given the near-term exhaustion of all available liquidity, result in a liquidation. The following is a summary of

MAINDOCS-#140202-v4-Phage_(Motion_Seeking_Approval_of_Bid_Procedures)

1  the general terms that are embodied in the Asset Purchase Agreement (the "Agreement")[1]

2  tendered by Buyer.

3  **A.    Assets to be Purchase and Liabilities to be Assumed**

4          Debtor shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase,

5  acquire, take assignment of, and accept, free and clear of any and all Liens, any and all of

6  Debtor's rights, title and interests in, to and under the Assets of Debtor in existence on the date

7  hereof and any additions thereto on or before the date of the consummation of the transaction

8  proposed herein (which is expect to occur on or about March 30, 2010) (the "Closing Date")

9  related to the business conducted by Debtor as of the date hereof, which business includes

10  commercializing efficient methods of development and manufacturing of bio-pharmaceuticals

11  and protein pharmaceuticals for human use in two classes (i) "bio-similar" versions of marketed

12  drugs whose patents have expired and (ii) new drug candidates developed by Debtor that will

13  undergo clinical trials, including longer-acting PEGylated versions of marketed protein products

14  (the "Business"), whether real, personal, or mixed, whether tangible or intangible, whether

15  accrued, contingent, or otherwise, whether or not carried on the books and records of Debtor,

16  including, but not limited to all of Debtor's right, title and interest in and to the Assets described

17  below:

18          (i)    all intellectual property owned or used by Debtor (including,
19  without limitation, the foreign and domestic patents, patent applications, including any
   continuations, continuations-in-part, and derivatives related thereto, and trade secrets;
20  trade names, trademarks, all internet websites, domain names, right to the name "Phage
   Biotechnology", "Phage" and any marks, logos and indicia related thereto, and any
21  permutation, variation or component thereof or other source identifiers, all other owned
   intellectual property and Debtor's rights in and to the licensed intellectual property),
22  wherever held or registered, including the right to sue and collect damages related thereto
   for past, present and future infringement of any of the foregoing; provided that such
23  Intellectual Property will remain subject only to the intellectual property license rights;

24          (ii)    certain assigned leases and contracts;
25
26          (iii)    all supplies, equipment (including, but not limited to, laboratory
   and operating equipment), computer hardware, telecommunication systems, printers,

27
28  [1] A true and correct copy of the Agreement, substantially in the form to be executed by the parties, is attached as Exhibit "1" to the Stegmann Declaration. The Agreement, when executed (contemplated to be prior to the bid procedures hearing) will be filed with the Court when so executed. To the extent there are any discrepancies between this summary and the Agreement, the terms in the Agreement shall govern.

-8-

servers, machinery, furniture, fixtures, leasehold improvements, and other tangible property owned or used by Debtor related to the Business and (A) located at either 6868 Nancy Ridge Drive, San Diego, CA 92121 or 6861 Nancy Ridge Drive, San Diego, CA 92121 (collectively, the Assumed Facilities), including any and all assets temporarily off-site for repair or other purposes or being shipped to Debtor, (B) used by the Assumed Facilities although located outside the Assumed Facilities;

(iv)    all trade and other accounts receivable (including, but not limited to, unbilled accounts receivable and accounts receivables due from CardioVascular BioTherapeutics, Inc. or its subsidiaries or affiliates ("CVBT")) owned by Debtor and any claim, remedy or other right related to any of the foregoing;

(v)    all subscription receivables (including, but not limited to, receivables due from GHL Financial Services LTD., Inc. or its affiliates or subsidiaries ("GHL") of the Business and any claim, remedy or other right related to any of the foregoing;

(vi)    any rights, claims, counterclaims, credits, causes of action, remedy or other rights related lawsuit against GHL or CVBT;

(vii)    all of Debtor's rights, claims, counterclaims, credits, causes of action and rights of set-off against third parties related to the Business, or otherwise related to the any Assumed Obligations, Purchased Assets or assigned contracts, including, without limitation, invention assignment agreements and confidentiality agreements, in effect on or prior to the Closing Date;

(viii)    all inventory owned or used by Debtor related to the Business;

(ix)    permits, business licenses, and other authorizations of governmental authorities and third parties of Debtor that are necessary to (A) the occupation of the Assumed Facilities, or (B) the operation of the Business;

(x)    any warranties, indemnities and guarantees of third parties on any Purchased Assets;

(xi)    any books of account, ledgers, financial, accounting and tax records and all general and personnel records, files, invoices, customers' and suppliers' lists, other distribution and mailing lists, price lists, reports, plans, advertising materials, catalogues, billing records, sales and promotional literature, manuals, and customer and supplier correspondence of Debtor that pertain to the Purchased Assets or the Business (collectively, the "Records");

(xii)    any claims, deposits, security deposits and other security, prepaid expenses and other prepayments, and prepaid assets, notes receivable and other miscellaneous receivables, causes of action, rights of recovery, rights of setoff, and rights of recoupment as of the Closing Date owned or enforceable by Debtor, including, without limitation, (A) accounts receivable from vendors, (B) prepayments and deposits with respect to freight costs, rent, cooperative advertising, computer and telecommunications costs, and occupancy costs, and travel advances, (C) claims or rights for refund or return of taxes, (D) any litigation claims, rights, and causes of action (including without

limitation stockholder derivative claims), and (E) the security deposits under the assigned leases totaling approximately US $165,429.00;

(xiii) all rights of Debtor to the telephone numbers used in the Business, including;

(xiv) certain lock boxes and other accounts of Debtor necessary for the operation of the Business;

(xv) without duplication, any other asset specifically indentified by Buyer;

(xvi) all cash generated by the operation of the Business or received by the Business at and after the Closing Date;

(xvii) all goodwill associated with the Purchased Assets and the Business; and

(xviii) other than the categories of assets enumerated above, all other assets of Debtor of every kind and description, tangible or intangible other than the Excluded Assets.

**B.     The Terms of the Proposed Sale.**

Based on the offer made by Buyer, Debtor proposes to sell its Assets to Buyer.  At Closing (as defined below), Buyer will pay to Debtor the purchase price as follows:

(i) $2,000,000 in the form of a reduction and satisfaction of an equivalent amount of the various debtor in possession financing obligations Debtor has to Buyer (any and all such loans and debts outstanding at any time, including principal, accrued interest and fees, hereinafter referred to as the "DIP Loan");

(ii) the assumption of the DIP Loan in excess of $2,000,000 (and, in the event Buyer, subject to further agreement(s) with Debtor and subject to Bankruptcy Court approval, Buyer is requested to and elects to provide additional financing to Debtor, an such additional financing shall be known as the "Overadvance"); provided, however, in the absence of any Overadvance and to the extent the DIP Loan at Closing is less than $2,500,000, Buyer shall pay to Debtor the difference between the DIP Loan and $2,500,000; and

(iii) shares of the Common Stock of Buyer constituting ten (10%) percent of the fully-diluted post-Closing equity of Buyer (the "Equity Shares"); provided, however, that

MAINDOCS-#140202-v4-Phage_(Motion_Seeking_Approval_of_Bid_Procedures)

1  (a) to the extent the DIP Loan exceeds $2,500,000 and/or (b) if any Overadvance exists,

2  the Equity Shares shall be reduced by ten (10%) percent for each $20,000 increment of the

3  aggregate total amount that the DIP Loan exceeds $2,500,000 and/or to the extent of any

4  Overadvance (collectively, the "Purchase Price").

5   Buyer is requiring that this sale shall close no later than March 30, 2010 ("Closing").  At

6 Closing, in the event Buyer has the highest bid, the deliveries constituting the Purchase Price

7 shall be effected and to the extent applicable delivered for deposit into the attorney trust account

8 of Debtor's counsel.

9  **C.**  **Proposed Overbid Procedures.**

10   Buyer has requested and Debtor proposes the following overbid procedures in connection

11 with the proposed sales transaction:

12    (i)  Binding offers to purchase the Assets to be sold under the Agreement

13  ("Qualified Offers") may be submitted up to three (3) days prior to the date a final

14  hearing is scheduled for the approval (the "Final Hearing") of the Agreement and any

15  ancillary documents required in such Agreement.  Two (2) business days prior to the

16  Final Hearing, a meeting (the "Offer Evaluation Process") will be held at Winthrop

17  Couchot Professional Corporation, 660 Newport Center Drive, Fourth Floor, Newport

18  Beach, California 92660, the offices of counsel to Debtor, for Debtor to determine in its

19  discretion, after consultation with its Creditors' Committee, that proceeding with the

20  Offer Evaluation Process is appropriate.

21    (ii)  Each Qualified Offer must include (i) a mark up of the Agreement to the

22  extent a Qualified Offer contemplates material changes thereto, (ii) detailed information

23  about the party making the Qualified Offer, including its financial and other capacity to

24  consummate the transaction, (iii) an identification of any executory contracts and leases

25  to be assumed by the party making the Qualified Offer, and (iv) information sufficient to

26  demonstrate that the party making the Qualified Offer will be able to provide parties to

27  such contracts and leases with adequate assurance of its ability to perform under them.

28  Although a Qualified Offer may be subject to some contingencies, any such

MAINDOCS-#140202-v4-Phage_(Motion_Seeking_Approval_of_Bid_Procedures)

contingencies shall be considered by Debtor when evaluating and comparing Qualified Offers.

(iii)     During the Offer Evaluation Process, Debtor shall evaluate the offers of any Qualified Offers submitted during the Offer Evaluation Process, provided that (i) any initial Qualified Offers provide consideration for the Assets that exceeds the consideration offered for such Assets by Buyer plus the Stalking Horse Protections (as defined below in (C)(iv)) (calculated under the assumption that the Stalking Horse Protections will aggregate approximately $300,000) and (ii) any such initial Qualified Offers provide a minimum cash component equal to the aggregate of (A) the DIP Loan outstanding at Closing and the Overadvance, if any, outstanding at Closing plus (B) the Stalking Horse Protections, plus (C) all administrative and priority expense claims. Any successive Qualified Offers (in the event of an auction or similar process) shall be considered only if they exceed the previous offer by $50,000. In comparing offers during the Offer Evaluation Process, and to the extent the Stalking Horse Protections are approved by the Court, the parties shall consider that selecting the offer of Buyer would avoid having to pay Buyer the Stalking Horse Protections. Debtor may recess the Offer Evaluation Process from time to time in its discretion in order to assess Qualified Offers or permit participants to alter or increase their Qualified Offers. Debtor may conduct the Offer Evaluation Process as an auction, a series of negotiations or whatever other means it determines to be appropriate in its business judgment.

(iv)     If the Assets to be sold pursuant to the Agreement are sold other than to Buyer (or an affiliate of Buyer) in accordance with the procedures provided in the Sale Motion, then Buyer shall be paid, out of the cash proceeds of such sale, (i) the sum of $100,000 (the "Break-Up Fee") and (ii) Buyer's reasonable and necessary out-of-pocket fees and costs, including costs of counsel, in an amount not to exceed $200,000 (the "Expense Reimbursement", and together with the Break-Up Fee, collectively the "Stalking Horse Protections"). The Stalking Horse Protections shall be entitled to status and payment as a super-priority administrative expense in Debtor's bankruptcy case.

-12-

MAINDOCS-#140202-v4-Phage_(Motion_Seeking_Approval_of_Bid_Procedures)

(v)     Debtor shall have the sole and absolute discretion, subject to approval of the Court, to determine the relative value of any Qualified Offer(s), to determine whether to accept or reject any Qualified Offer(s), subject to Buyer's entitlement to the Stalking Horse Protections as set forth herein, and to determine which Qualified Offer(s) it deems to be the highest and best offer available. Specifically, in evaluating competing Qualified Offers, Debtor shall not be limited to price as the determinative factor, but may consider other factors, including, without limitation, the financial qualifications of the party or parties submitting the Qualified Offer(s) and the likelihood that the proposed acquisition transaction will close within a timeframe acceptable to Debtor.

(vi)     If Buyer's final bid is not the highest bid, upon the closing of a sale of the Assets to another entity, Buyer shall be delivered the Stalking Horse Protection (as well as receive full payment of the DIP Loan and any Overadvance). If Buyer is the successful bidder, then it must tender the consideration constituting its successful bid. **NOTWITHSTANDING THE FOREGOING PROCEDURES, SINCE THE PRECISE AMOUNT OF THE PURCHASE PRICE CANNOT BE DETERMINED AT THIS TIME (though presently calculated, at minimum, in the amount of $2,700,000), PROSPECTIVE PURCHASERS MAY AND ARE ENCOURAGED TO SUBMIT BIDS FOR PURCHASE OF SUBSTANTIALLY ALL ASSETS OF THE ESTATE UTILIZING THE AGREEMENT AS A TEMPLATE.**

Debtor's management believes that establishing uniform procedures for bidding on the Assets will allow Debtor and the Court to promptly review, analyze and compare all bids received to determine which bid is in the best interests of Debtor. Additionally, the proposed overbid procedures are fair and equitable.

**D.     <u>Stalking Horse Protection Fee.</u>**

If the Assets are sold other than to Buyer or one of its affiliates in accordance with the procedures provided herein and in the Sale Motion, then Buyer shall be paid, out of the cash proceeds of such sale the Stalking Horse Protection. The Stalking Horse Protections shall be entitled to status and payment as a super-priority administrative expense in this bankruptcy case,

-13-

1    but shall be payable only from the cash proceeds of the sale of the Assets.

2    **IV.**

3    **GOOD CAUSE EXISTS TO APPROVE THE OVERBID PROCEDURES**

4    As set forth in the Stegmann Declaration, Debtor believes that the overbid procedures set

5    forth above are reasonable. In the context of bankruptcy, sales such as the pending transaction

6    between Debtor and Buyer become even more challenging, due in part to a Debtor's duty to

7    maximize the value of estate assets and the obligation to encourage competitive bidding in order

8    to achieve the highest and best price. It is clear that few potential buyers of the Assets would be

9    willing to enter into a purchase agreement in the context of a bankruptcy proceeding without

10    some assurance that, on the one hand, the "stalking horse" protections are provided to the initial

11    catalytic purchaser, and on the other hand, that the bidding process will be fair and equitable and

12    will treat all parties equally.

13    In this instance, Debtor believes that the proposed overbid procedures are fair and

14    equitable, and treat all parties equally. Moreover, as set forth in the Stegmann Declaration, the

15    amount of the initial overbid in this case is necessary to encourage bidding for the Assets.

16    Moreover, subsequent overbids in increments of $50,000 equal no more than two percent (2%)

17    of the potential purchase price. Based upon the foregoing, Debtor respectfully requests that the

18    Court approve the overbid procedures outlined above.

19    **V.**

20    **THE BREAK-UP FEE SHOULD BE APPROVED**

21    Aside from the proposed overbid procedures, Buyer has required a "break-up" fee in the

22    event that an overbid occurs and Buyer is not the ultimate purchaser of the Assets. Specifically,

23    under the terms of the Agreement, in the event that another party is successful in purchasing the

24    Assets, Debtor is required to pay to Buyer the Stalking Horse Protections to compensate Buyer

25    for its costs and expenditures, including lost opportunity costs. Of significant import, under

26    such circumstance, the break-up fee will be paid upon the closing of the sale to the alternative

27    successful bidder and shall be paid from the proceeds of the purchase price tendered by the

28    successful bidder in connection with the Qualifying Competing Proposal.

-14-

1       In scrutinizing break-up fees or topping fees, bankruptcy courts typically employ a

2  dynamic case-by-case approach whereby a court "must take into consideration what is in the

3  best interests of the estate."  See In re Wilde Horse Enters., Inc., 136 B.R. 830, 841 (Bankr. C.D.

4  Cal. 1991); see also, In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (standard for

5  approval of break-up fees is whether the transaction will "further the diverse interests of the

6  debtor, creditors and equity holders, alike"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28

7  (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to

8  convince a white knight to enter the bidding by providing some form of compensation for the

9  risks it is undertaking") (citations omitted); In re Marrose Corp., Case Nos. 89 B 12171-12179

10  (B), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "[a]greements to provide

11  breakup fees or reimbursement of fees and expenses are meant to compensate the potential

12  acquirer who serves as a catalyst or 'stalking horse,' which attracts more favorable offers");

13  Mark F. Hebbeln, THE ECONOMIC CASE FOR JUDICIAL DEFERENCE TO BREAK-UP FEE

14  AGREEMENTS IN BANKRUPTCY, 13 Bankr. Dev. J. 475, 502-505 (1997) (unless the court

15  determines that a break-up fee arrangement is tainted with self-dealing, fraud, or bad faith,

16  courts should accord "substantial deference" to the fiduciary duty of the debtor's board members

17  who approved the terms of the break-up fee).

18       Break-up fee arrangements outside bankruptcy are presumptively valid under the

19  business judgment rule.  See In re Integrated Res., Inc., 147 B.R. 650 (Bankr. S.D.N.Y. 1992)

20  citing Cottle v. Storer Commc'ns, Inc., 849 F.2d 570 (11th Cir. 1988) (US $29,000,000

21  termination fee protected by business judgment rule); CRTF Corp. v. Federated Dep't Stores,

22  683 F.Supp. 422 (S.D.N.Y. 1988) (break-up fees not illegal when they enhance rather than

23  hamper bidding).  The Integrated Res. court found that courts addressing this issue have

24  routinely asked the following questions:

25       First, is the relationship of the parties who negotiated the break-up fee tainted by

26  manipulation such that the business judgment rule should not be applied?  A court will uphold a

27  decision by the board of directors if the decision was safeguarded by the scrutiny of disinterested

28

1    directors or other means, such as scrutiny by a creditors' committee. See Integrated Res., 147

2    B.R. at 657.

3        Second, does the fee materially hamper bidding?  In assessing the incentive or effect of a

4    break-up fee, the court should determine whether the amount of the break-up fee is so substantial

5    that it has a "chilling" effect. See id. at 660.

6        Third, is the amount of the fee unreasonable relative to the proposed purchase price?  A

7    break-up fee should constitute a fair and reasonable percentage of the proposed purchase price,

8    and should be reasonably related to the risk, effort and expenses of the prospective purchaser.

9    See id. at 662.

10        As set forth in the Stegmann Declaration, no "self-dealing" or manipulation exists with

11    respect to the letter of intent.  Debtor has been marketing its assets.  The sales transaction was

12    negotiated at arms-length and is fair and reasonable, particularly given Debtor's financial

13    condition and the circumstances of this case.  Buyer negotiated the break-up fee and expense

14    reimbursement simply to compensate itself for the risk it has assumed of losing other business

15    and investment opportunities while the bidding process unfolds, its costs and expenses in the

16    event it is unable to acquire the Assets, and other opportunity costs.  Debtor is advised that the

17    break-up fee is based on and is a reflection of the risk, effort and expense anticipated to be

18    incurred by Buyer in negotiating and consummating the terms of the purchase agreement.  Given

19    the complexity of the transaction, Debtor is advised that the break-up fee will not result in a

20    "windfall" to Buyer.  Additionally, Debtor believes that the break-up fee:   (1) encouraged Buyer

21    to make the initial "stalking horse" offer; (2) may discourage a bidding strategy designed to hold

22    back competitive bids until late in the process; (3) aided Debtor in negotiating an initial bid that

23    may be Buyer's highest bid; (4) may establish a high floor early in the bidding process; and

24    (5) has enhanced the bidding process by creating momentum towards the consummation of a

25    sale.

26        Based upon the foregoing, Debtor respectfully requests that the Court approve the break-

27    up fee as set forth above.

28

-16-

MAINDOCS-#140202-v4-Phage  (Motion  Seeking  Approval_of_Bid_Procedures)

# VI.

## RELIEF SOUGHT TO BE SOUGHT IN SALE MOTION

The Sale Motion shall seek entry of an order (the "Sale Order"), in form and substance mutually and reasonably acceptable to Buyer and Debtor, approving and authorizing the Agreement and the transactions contemplated thereby and providing for all necessary and customary findings and holdings, including at minimum the following: (i) that the Assets shall be sold free and clear of any and all Liens, with such Liens, if any, to attach to the consideration to be received by Debtor in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and Buyer would not enter into the Agreement or purchase the Assets otherwise; and (ii) the transfer of the Assets to Buyer will be a legal, valid and effective transfer of the Assets, and will vest Buyer with all right, title and interest of Debtor to the Assets free and clear of any and all Liens, including any such Liens (A) that purport to give or transfer to any party any right, entitlement or ability to exercise ownership, joint ownership, control or similar interest whatsoever, or to exercise, utilize or exploit any license, sub-license or similar interest whatsoever, over, in, relating to, regarding or with respect to any of the Assets, including without limitation any Intellectual Property, (B) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of Debtor's or Buyer's interest in the Assets, or similar rights, or (C) relating to Taxes or any other Liabilities relating to the Assets, Debtor, or the Business, other than the Assumed Obligations.

# VII

## GOOD CAUSE EXISTS TO GRANT THIS MOTION

Debtor believes and hereby respectfully represents that good cause exists, under the circumstances of this case, for this Court's granting of the Motion. Debtor has received an offer from Buyer for the sale of Debtor's assets, which must be consummated as soon as possible in order to preserve the bid and maximize value for creditors. Establishing overbid procedures to all parties in interest in advance of the hearing on the Sale Motion will give prospective bidders sufficient time to evaluate the relief sought and to determine whether to bid. Granting the relief sought in the Motion will effect the foregoing.

MAINDOCS-#140202-v4-Phage_(Motion_Seeking_Approval_of_Bid_Procedures)

1      In order to preserve the value of the Assets, Buyer seeks to close promptly on the

2  purchase of Debtor's Assets.  Debtor believes that, in order to preserve the sale of the Assets for

3  Debtor, it is in the best interests of Debtor's estate to conclude the sale as expeditiously as

4  possible, taking into consideration the legitimate rights of creditors and parties interested in

5  overbidding to obtain adequate notice of the hearing on, and opportunity to object to, the Sale

6  Motion.

7  **VIII.**

8  **CONCLUSION**

9      For the foregoing reasons, Debtor respectfully requests that the Court grant this

10  Procedures Motion approving the proposed overbid procedure and break-up fee and schedule a

11  hearing on the Sale Motion such that a closing can occur by no later than March 30, 2010.

12  DATED:  February 22, 2010        **WINTHROP COUCHOT**

                               **PROFESSIONAL CORPORATION**
13

14                                 By:___/s/ Marc Winthrop_____

                                    Marc J. Winthrop
15                                      Samir D. Parikh

                             General Insolvency Counsel for Debtor and
16                               Debtor-in-Possession

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF DR. THOMAS J. STEGMANN

I, Dr. Thomas J. Stegmann, hereby declare and state as follows:

1.       I am the Chief Executive Officer of Phage Biotechnology Corporation, the debtor and debtor-in-possession herein (the "Debtor").  The facts stated herein are within my personal knowledge or information, whether acquired directly, or through my familiarity with Debtor.  The opinions expressed herein represent the opinions of Debtor entity, of which I am an authorized agent, unless otherwise indicated.

2.       From the outset of this case, Debtor's ability to reorganize its financial affairs in Chapter 11 has been dependent upon, among other things, access to cash to enable Debtor to pursue U.S. Food and Drug Administration ("FDA") approval of its bio-generic and proprietary drug portfolio.   Unfortunately, Debtor has been unable to generate sufficient revenues to internally finance its operations, and has similarly been unable to obtain the requisite amount of financing it believes is necessary to pursue its business strategy.  Moreover, Debtor's ability to generate profits is hampered by the significant administrative costs associated with the bankruptcy and the negative effect on sales resulting from the stigma associated with operating as a debtor-in-possession.

3.       Fortunately, through Debtor's pre-petition and post-petition marketing efforts, Debtor has identified a strategic buyer who has proposed to purchase substantially all its assets ("Assets") for an amount greater than liquidation value, which would maximize the return to creditors.  Based on Debtor's current financial condition, the weak economy, and the lack of offers received for the Assets, Debtor believes that a prompt sale of Debtor's Assets is necessary to maximize value and recovery to creditors.  Debtor has been seeking a buyer or financial partner since October 2008.  A list of all contacts/companies that were contacted is attached hereto as Exhibit A.

4.       While the specific amount of the proposed bid submitted by Buyer cannot be precisely determined at this time (though estimated to be net less than $2,700,000), based on the structure of the proposal, the proposed bid clearly provides substantially more value than would

1  be realized in a liquidation sale.  Moreover, Debtor's cash resources and DIP Loan availability

2  will likely be substantially exhausted by March 30, 2010.

3       5.     A court-approved uniform sale and bidding procedures and guidelines can lead

4  to an orderly sale at the hearing thereon.  In this regard, it is necessary to obtain a Court order

5  approving the proposed overbid procedures and break-up fee as soon as possible to include in

6  the court-approved sale and overbid procedures in the Sale Motion

7       6.     Debtor is in the business of developing and commercializing an efficient method

8  of manufacturing bio-pharmaceuticals with its proprietary technology.  On October 2, 2008,

9  certain creditors commenced an involuntary Chapter 7 case against Debtor (the "Petition Date").

10  On October 28, 2008, the Court entered an order for relief converting this case into a voluntary

11  Chapter 11 case.

12       7.     Debtor is a Delaware corporation with its corporate office and operating facilities

13  located in San Diego, California.  Debtor currently employs 11 people, including part time

14  employees and consultants of various kinds.  From Debtor's inception until October 7, 2008,

15  Debtor's Chairman, President, and CEO was Daniel Montano ("Montano").  Mr. Montano

16  resigned from all positions with Debtor on or about October 7, 2008.

17       8.     Debtor was founded in 1998 to commercialize an efficient method of

18  manufacturing bio-pharmaceuticals that were invented by a group of Ukrainian scientists.  As a

19  development stage company which is still not generating significant revenue, Debtor depends

20  significantly on external funding for survival and progress.  A majority of the external funding

21  provided to Debtor prior to the Petition Date came from the holders (the "Noteholders") of

22  Debtor's promissory notes (the "Notes").  Debtor's promissory notes were issued at various

23  dates from 2001 through to 2004 with a three-year maturity date.  Debtor raised a total of

24  approximately $16,700,000 in the period from 2001 to 2005 from two series of convertible

25  promissory notes.  Series I totaled approximately $11,600,000 principal with 233 Noteholders

26  and Series II totaled approximately $5,100,000 of principal with 20 Noteholders.  The principal

27  and accrued interest of these Notes now total approximately $23,500,000, or approximately

28  75% of Debtor's total debt. The corporate books of record of Debtor are unaudited.

9.      Debtor has a contractual relationship with Phage Biotech Ukraine LLC, located in Kiev, Ukraine ("Phage Ukraine"), which employs a research team and supports the San Diego manufacturing facility. Substantially all of Debtor's original intellectual property was sourced from Phage Ukraine.

10.     Debtor's intellectual property includes numerous U.S. patents and related foreign patent approvals in European countries with large markets for Debtor's drugs. In Japan, three of Debtor's U.S. Patents are currently being examined.

11.     Debtor's main route to commercialization and profitability has always been to seek further revenue generating activities for its licensed San Diego manufacturing facility, and to gain FDA approval for its bio-generic and proprietary drug portfolio to be manufactured by the Phage process. At present two compounds are in FDA clinical trials: Phage's Human Growth Hormone ("HGH"), and Phage's Fibroblast Growth Factor 1 ("FGF-1").

12.     Debtor's financial problems and the consequent need to file this bankruptcy proceeding were primarily caused by a variety of factors. As a start-up company, Debtor has minimal income and thus needs infusions of outside capital in order to fund its operations of developing and commercializing its intellectual property. From 1998 to 2008, Debtor raised net capital proceeds of approximately $24,500,000 from common and preferred stock, and note and loan financing. However, from late summer 2005 until summer of 2008, Debtor only raised net proceeds of approximately $6,000,000 million of outside capital which was grossly inadequate in relation to Debtor's needs, maturing Note obligations, and the scale of its opportunity. This failure to raise sufficient capital in the last several years led to Debtor defaulting on its Note obligations, as well as obligations to other creditors.

13.     Buyer is a limited private company organized under the laws of the Republic of Singapore.

14.     Debtor has been actively marketing itself for investment or sale since October 2008. Since the filing, Debtor has redoubled its efforts and has been actively seeking an investor to infuse capital into Debtor to file a plan of reorganization. Debtor has been in regular

1   contact with the creditors' committee to report on these results, which, to date, have yielded no

2   results.

3       15.    The prompt sale of the Assets will maximize the value of Debtor's estate.  The

4   following is a summary of the general terms that are embodied in the Asset Purchase

5   Agreement (the "Agreement") proposed by Buyer.

6       16.    Based on the offer made by Buyer, Debtor proposes to the Assets to Buyer (the

7   "Purchased Assets").  At Closing (as defined below), Buyer will pay to Debtor the purchase

8   price pursuant to the following:  (i) $2,000,000 in the form of a reduction and satisfaction of an

9   equivalent amount of the various debtor in possession financing obligations Debtor has to Buyer

10  (any and all such loans and debts outstanding at any time, including principal, accrued interest

11  and fees, hereinafter referred to as the "DIP Loan"); (ii) the assumption of the DIP Loan in

12  excess of $2,000,000 (and, in the event Buyer, subject to further agreement(s) with Debtor and

13  subject to Bankruptcy Court approval, Buyer is requested to and elects to provide additional

14  financing to Debtor, an such additional financing shall be known as the "Overadvance");

15  provided, however, in the absence of any Overadvance and to the extent the DIP Loan at Closing

16  is less than $2,500,000, Buyer shall pay to Debtor the difference between the DIP Loan and

17  $2,500,000; and (iii) shares of the Common Stock of Buyer constituting ten (10%) percent of the

18  fully-diluted post-Closing equity of Buyer (the "Equity Shares"); provided, however, that (a) to

19  the extent the DIP Loan exceeds $2,500,000 and/or (b) if any Overadvance exists, the Equity

20  Shares shall be reduced by ten (10%) percent for each $20,000 increment of the aggregate total

21  amount (x) that the DIP Loan exceeds $2,500,000 and (y) of the Overadvance (collectively, the

22  "Purchase Price").

23      17.    Buyer is requiring that this sale shall close no later than March 30, 2010

24  ("Closing").  At Closing, in the event Buyer has the highest bid, the deliveries constituting the

25  Purchase Price shall be effected and to the extent applicable, delivered for deposit into the

26  attorney trust account of Debtor's counsel.

27      18.    Buyer has requested and Debtor proposes the following overbid procedures in

28  connection with the proposed sales transaction:

-22-

(i)     Binding offers to purchase the Assets to be sold under the Agreement ("Qualified Offers") may be submitted up to three (3) days prior to the date a final hearing is scheduled for the approval (the "Final Hearing") of the Agreement and any ancillary documents required in such Agreement.  Two (2) business days prior to the Final Hearing, a meeting (the "Offer Evaluation Process") will be held at Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Fourth Floor, Newport Beach, California 92660, the offices of counsel to Debtor, for Debtor to determine in its discretion, after consultation with its Creditors' Committee, that proceeding with the Offer Evaluation Process is appropriate.

(ii)     Each Qualified Offer must include (i) a mark up of the Agreement to the extent a Qualified Offer contemplates material changes thereto, (ii) detailed information about the party making the Qualified Offer, including its financial and other capacity to consummate the transaction, (iii) an identification of any executory contracts and leases to be assumed by the party making the Qualified Offer, and (iv) information sufficient to demonstrate that the party making the Qualified Offer will be able to provide parties to such contracts and leases with adequate assurance of its ability to perform under them. Although a Qualified Offer may be subject to some contingencies, any such contingencies shall be considered by Debtor when evaluating and comparing Qualified Offers.

(iii)     During the Offer Evaluation Process, Debtor shall evaluate the offers of any Qualified Offers submitted during the Offer Evaluation Process, provided that (i) any initial Qualified Offers provide consideration for the Assets that exceeds the consideration offered for such Assets by Buyer plus the Stalking Horse Protections (as defined below in (18)(iv)) (calculated under the assumption that the Stalking Horse Protections will aggregate approximately $300,000) and (ii) any such initial Qualified Offers provide a minimum cash component equal to the aggregate of (A) the DIP Loan outstanding at Closing and the Overadvance, if any, outstanding at Closing plus (B) the Stalking Horse Protections, plus (C) all administrative and priority expense claims.  Any

-23-

successive Qualified Offers (in the event of an auction or similar process) shall be
considered only if they exceed the previous offer by $50,000.  In comparing offers during
the Offer Evaluation Process, and to the extent the Stalking Horse Protections are
approved by the Court, the parties shall consider that selecting the offer of Buyer would
avoid having to pay Buyer the Stalking Horse Protections.  Debtor may recess the Offer
Evaluation Process from time to time in its discretion in order to assess Qualified Offers
or permit participants to alter or increase their Qualified Offers.  Debtor may conduct the
Offer Evaluation Process as an auction, a series of negotiations or whatever other means
it determines to be appropriate in its business judgment.

(iv)     If the Assets to be sold pursuant to the Agreement are sold other than to
Buyer (or an affiliate of Buyer) in accordance with the procedures provided in the Sale
Motion, then Buyer shall be paid, out of the cash proceeds of such sale, (i) the sum of
$100,000 (the "Break-Up Fee") and (ii) Buyer's reasonable and necessary out-of-pocket
fees and costs, including costs of counsel, in an amount not to exceed $200,000 (the
"Expense Reimbursement", and together with the Break-Up Fee, collectively the
"Stalking Horse Protections").  The Stalking Horse Protections shall be entitled to status
and payment as a super-priority administrative expense in Debtor's bankruptcy case.

(v)     Debtor shall have the sole and absolute discretion, subject to approval of
the Court, to determine the relative value of any Qualified Offer(s), to determine whether
to accept or reject any Qualified Offer(s), subject to Buyer's entitlement to the Stalking
Horse Protections as set forth herein, and to determine which Qualified Offer(s) it deems
to be the highest and best offer available.  Specifically, in evaluating competing Qualified
Offers, Debtor shall not be limited to price as the determinative factor, but may consider
other factors, including, without limitation, the financial qualifications of the party or
parties submitting the Qualified Offer(s) and the likelihood that the proposed acquisition
transaction will close within a timeframe acceptable to Debtor.

(vi)     If Buyer's final bid is not the highest bid, upon the closing of a sale of the
Assets to another entity, Buyer shall be delivered the Stalking Horse Protection (as well

as receive full payment of the DIP Loan and any Overadvance). If Buyer is the successful bidder, then it must tender the consideration constituting its successful bid.

19.    Establishing uniform procedures for bidding on the Assets will allow Debtor and the Court to promptly review, analyze and compare all bids received to determine which bid is in the best interests of Debtor. Additionally, the proposed overbid procedures are fair and equitable.

20.    If the Assets are sold other than to Buyer (or an affiliate of Buyer) in accordance with the procedures provided herein and in the Sale Motion, then Buyer shall be paid, out of the cash proceeds of such sale, the Stalking Horse Protections. The Stalking Horse Protections shall be entitled to status and payment as a super-priority administrative expense in this bankruptcy case, but shall be payable only from the cash proceeds of the sale of the Assets.

21.    The overbid procedures set forth above are reasonable. In the context of bankruptcy, sales such as the pending transaction between Debtor and Buyer become even more challenging, due in part to a Debtor's duty to maximize the value of estate assets and the obligation to encourage competitive bidding in order to achieve the highest and best price. It is clear that few potential buyers of the Assets would be willing to enter into a purchase agreement in the context of a bankruptcy proceeding without some assurance that, on the one hand, the "stalking horse" protections are provided to the initial catalytic purchaser, and on the other hand, that the bidding process will be fair and equitable and will treat all parties equally.

22.    The proposed overbid procedures are fair and equitable, and treat all parties equally. Moreover, the amount of the initial overbid in this case and subsequent overbids are necessary to encourage bidding for the Assets.

23.    Aside from the proposed overbid procedures, Buyer has required a "break-up" fee in the event that an overbid occurs and Buyer is not the ultimate purchaser of the Assets. Specifically, under the terms of the Agreement, in the event that another party is successful in purchasing the Assets, Debtor is required to pay to Buyer the Stalking Horse Protections to compensate Buyer for its costs and expenditures, including lost opportunity costs. Of significant import, under such circumstance, the break-up fee will be paid upon the closing of the sale to the

-25-

MAINDOCS-#140202-v4-Phage_(Motion_Seeking_Approval_of_Bid_Procedures)

1    alternative successful bidder and shall be paid from the proceeds of the purchase price tendered

2    by the successful bidder in connection with the Qualifying Competing Proposal.

3        24.    No manipulation exists with respect to the Agreement. Debtor has been

4    marketing its assets. The sales transaction was negotiated at arms-length and is fair and

5    reasonable, particularly given Debtor's financial condition and the circumstances of this case.

6    Buyer negotiated the break-up fee and expense reimbursement simply to compensate itself for

7    the risk it has assumed of losing other business and investment opportunities while the bidding

8    process unfolds, its costs and expenses in the event it is unable to acquire the Assets, and other

9    opportunity costs. Debtor is advised that the break-up fee is based on and is a reflection of the

10    risk, effort and expense anticipated to be incurred by Buyer in negotiating and consummating the

11    terms of the purchase agreement. Given the complexity of the transaction, Debtor is advised that

12    the break-up fee will not result in a "windfall" to Buyer. Additionally, Debtor believes that the

13    break-up fee: (1) encouraged Buyer to make the initial "stalking horse" offer; (2) may

14    discourage a bidding strategy designed to hold back competitive bids until late in the process;

15    (3) aided Debtor in negotiating an initial bid that may be Buyer's highest bid; (4) may establish a

16    high floor early in the bidding process; and (5) has enhanced the bidding process by creating

17    momentum towards the consummation of a sale.

18        25.    Good cause exists, under the circumstances of this case, for this Court's granting

19    of this Procedures Motion. Debtor has received an offer from Buyer for the sale of Debtor's

20    Assets, which must be consummated as soon as possible in order to preserve the bid and

21    maximize value for creditors. Establishing overbid procedures to all parties in interest in

22    advance of the hearing on the Sale Motion will give prospective bidders sufficient time to

23    evaluate the relief sought and to determine whether to bid. Granting the relief sought in the

24    Motion will effect the foregoing.

25        26.    In order to preserve the value of the Assets, Buyer seeks to close promptly on the

26    purchase of Debtor's Assets. Debtor believes that, in order to preserve the sale of the Assets for

27    Debtor, it is in the best interests of Debtor's estate to conclude the sale as expeditiously as

28    possible, taking into consideration the legitimate rights of creditors and parties interested in

1 | overbidding to obtain adequate notice of the hearing on, and opportunity to object to, the Sale

2 | Motion.

3 |      I declare under penalty of perjury under the laws of the United States of America that the

4 | foregoing is true and correct to the best of my knowledge.

5 |      Executed this 22nd day of February 2010, at Petersberg, Germany.

6

7 |           /s/ Dr. Thomas J. Stegmann

8 |           Dr. Thomas J .Stegmann

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MAINDOCS-#140202-v4-Phage_(Motion_Seeking_Approval_of_Bid_Procedures)



## Phage Biotechnology Corporation
## List of contacts/interested parties/potential investors/potential cooperations
## November 2008 – February 2010

| 1. | Abbott Laboratories, Abbott Park, IL, USA, www.abbott.com<br>U.S. Corporate Headquarters<br>Abbott Laboratories<br>100 Abbott Park Road<br>Abbott Park, Illinois 60064-3500<br>Telephone: (847) 937-6100 |
|---|---|
| 2. | Achillion Pharmaceuticals, Inc., New Haven, CT, USA, www.achillion.com<br>Headquarters<br>Achillion Pharmaceuticals, Inc.<br>300 George Street<br>New Haven, CT 06511<br>Telephone:  203-624-7000<br>Fax:  203-624-7003 |
| 3. | Advanced BioHealing, Inc., Wayne, PA, USA, www.advancedbiohealing.com<br>Corporate Offices<br>36 Church Lane<br>Westport, CT 06880 |
| 4. | Anadys Pharmaceuticals, Inc., San Diego, CA www.anadyspharma.com<br>Corporate Headquarters<br>Anadys Pharmaceuticals, Inc.<br>5871 Oberlin Drive, Suite 200<br>San Diego, CA 92121<br>Tel: (858) 530-3600<br>Fax: (858) 527-1540<br>E-mails:<br>Business Development - clogan@anadyspharma.com<br>Corporate Communications - cc@anadyspharma.com<br>Human Capital - hc@anadyspharma.com |
| 5. | Angelico Ventures, Moscow, Russia, www.angelicobiotech.com<br>Angelico Ventures<br>9-105 Esseninsky boulevard 109439 Moscow, Russia<br>Phone: +7 916 3888355<br>E-mail: Web: www.angelicobiotech.com |

Exhibit _A_
Page _28_

| 6. | Avila Therapeutics, Inc., Waltham, MA, USA, www.avilatx.com<br>Avila Therapeutics, Inc.<br>100 Beaver Street<br>Waltham, MA 02453<br>Telephone: 781-891-0086<br>Facsimile: 781-891-0069<br>Email: info@avilatx.com |
|---|---|
| 7. | BioMarin Pharmaceutical Inc., Novato, CA, USA, www.bmrn.com<br>Headquarters<br>BioMarin Pharmaceutical Inc.<br>105 Digital Drive<br>Novato, CA 94949<br>Tel: 415-506-6700<br>Fax: 415-382-7889<br>Investor Relations: ir@bmrn.com<br>Business Development: bd@bmrn.com |
| 8. | BioMed Transition Partners, New York, USA, www.Biomedtransitionpartners.com<br>Headquarters<br>BioMarin Pharmaceutical Inc.<br>105 Digital Drive<br>Novato, CA 94949<br>Tel: 415-506-6700<br>Fax: 415-382-7889<br>Investor Relations: ir@bmrn.com<br>Business Development: bd@bmrn.com |
| 9. | Biopartners GmbH, Baar, Switzerland, www.biopartners.ch<br>International Headquarters:<br>Biopartners GmbH<br>Baarermatte<br>6340 Baar<br>Switzerland<br>Telephone +41 (0) 41 766 20 80<br>Fax +41 (0) 41 766 20 81 |
| 10. | Biotech Turnaround Fund BV, Haarlem, The Netherlands, www.btf.eu<br>BTF<br>Kenaupark 3<br>2011 MP Haarlem<br>The Netherlands<br><br>BTF Geyserville<br>P.O. Box 347<br>Geyserville, CA 95441<br>USA<br>T +31 (0)23 - 55 33 988<br>F +31 (0)23 - 55 33 980 |

*A*
*29*

| 11. | Bloom Burton & Co., Toronto, Canada, www.bloomburton.com |
| | 65 Front Street East |
| | Suite 300 |
| | Toronto, ON M5E 1B5 |
| | T 416-640-7580 |
| | Email:  bbloom@bloomburton.com |
| 12. | Boehringer Ingelheim Pharma GmbH & Co. KG, Ingelheim, Germany, |
| | www.boehringer-ingelheim.de |
| | Binger Straße 173 |
| | 55216 Ingelheim am Rhein |
| | E-Mail: presse@boehringer-ingelheim.de |
| | Telefon: 06132 / 77-0 |
| | Telefax: 06132 / 72-0 |
| 13. | Bristol-Myers Squib, New York, USA, www.bms.com |
| | Corporate Headquarters |
| | 345 Park Avenue |
| | New York, New York 10154 |
| | Customer Relations at 800-332-2056 |
| 14. | Cangene Corporation, Winnipeg, MB, Canada, www.cangene.com |
| | Head Office/Manufacturing |
| | 155 Innovation Drive |
| | Winnipeg, MB, Canada |
| | R3T 5Y3 |
| | Tel: (204) 275-4200 |
| | Fax: (204) 269-7003 |
| 15. | Critical Pharmaceuticals Ltd., Nottingham, UK, www.criticalpharmaceuticals.com |
| | BioCity Nottingham |
| | Pennyfoot Street |
| | Nottingham |
| | NG1 1GF |
| | United Kingdom |
| | Tel.: +44 (0)115 8820 100 |
| | E-mail: info@criticalpharmaceuticals.com |
| 16. | Debiopharm Group, Lausanne, Switzerland, www.debiopharm.com |
| | **Debiopharm S.A. & Debioinnovation** |
| | Forum "après-demain" |
| | Chemin Messidor 5-7 |
| | Case postale 5911 |
| | CH - 1002 Lausanne |
| | Switzerland |
| | T+41 (0) 21 321 0111 |
| | F+41 (0) 21 321 0169 |
| | |
| | **Debiopharm Galenic Unit** |
| | 14, Rte des Avouillons |
| | CH - 1196 Gland |

Exhibit ____4____

Page ____30____

Switzerland
T+41 (0) 22 354 88 88
F+41 (0) 22 354 88 89

**Debio Recherche Pharmaceutique S.A.**
Route du Levant 146
CH-1920 Martigny
Switzerland
T+41 (0) 27 721 7900
F+41 (0) 27 721 7901

**Debioclinic S.A.**
2, rue du Nouveau Bercy
F- 94220 Charenton-le-Pont
France
T+33 (0) 1 43 53 64 30
F+33 (0) 1 43 53 64 39

| | |
|---|---|
| 17. | Eli Lilly and Company, Indianapolis, IN, USA, www.lilly.com<br>Lilly Corporate Center<br>Indianapolis, Indiana 46285 USA<br>Phone: +1-317-276-2000<br><br>**Intercontinental**<br>(Asia, Latin America, Canada, Australia)<br>Lilly Corporate Center<br>Mail Drop Code 1854<br>Indianapolis, Indiana 46285<br>U.S.A<br><br>ICR Telephone Calls Only: +1-317-276-2790<br>U.S. Switchboard: +1-317-276-2000<br>Fax: +1-317-276-4878 |
| 18. | Emisphere Technologies, Inc., Cedar Knolls, NJ, USA, www.emisphere.com<br>Corporate Headquarters:<br>240 Cedar Knolls Road<br>Cedar Knolls, New Jersey 07927-1621<br>973-532-8000 (phone)<br>973-532-8115 (fax) |
| 19. | EUGENEX Biotechnologies GmbH, Taegerwilen, Switzerland, www.eugenex.com<br>Telephone Office ++49 (0)7533 97623<br>Telephone Lab++41 (0)71 666 43 60 AND ++41 (0)71 666 43 61<br>Cellular ++49 (0)177 77 97623<br>FAX ++49 (0)7533 97624<br><br>**Postal address**<br>EUGENEX Biotechnologies<br>Konstanzerstrasse 19<br>CH-8274 Tägerwilen |

Exhibit ___4___

Page ___31___

|  | Switzerland<br>**Electronic mail**<br>General Information: info@eugenex.com<br>Sales: sales@eugenex.com<br>Customer Support: support@eugenex.com |
|---|---|
| 20. | Firminvest AG, Zuerich, Switzerland, www.moneyhouse.ch/u/firminvest_ag_CH<br>Lindenstrasse 16<br>CH – 6340 Baar |
| 21. | Genentech Inc. San Francisco, CA, USA, www.gene.com<br>Corporate Headquarters Genentech, Inc.<br>1 DNA Way<br>South San Francisco, CA 94080-4990<br>Phone: (650) 225-1000<br>Fax: (650) 225-6000 |
| 22. | Genmab A/S, Copenhagen, Denmark, www.genmab.com<br>*Genmab A/S*<br>General inquiries: info@genmab.com<br>Business development inquiries: licensing@genmab.com<br><br>Visiting Address –<br>Bredgade 34<br>1260 Copenhagen K<br>Denmark<br><br>Postal Address<br>P.O. Box 9068<br>1260 Copenhagen K<br>Denmark<br><br>Telephone + 45 7020 2728<br>Fax + 45 7020 2729<br>Helle Husted, M.A.<br>Vice President, Investor Relations<br>h.husted@genmab.com |
| 23. | Gilead Sciences, Inc., Foster City, CA, USA, www.gilead.com<br>Foster City, CA (Headquarters):<br>333 Lakeside Drive<br>Foster City, CA 94404<br>Phone: (650) 574-3000<br>Fax: (650) 578-9264<br>1-800-GILEAD-5 (1-800-445-3235 |
| 24. | Human BioSciences GmbH, Luckenwalde, Germany, www.humanbiosciences.de<br>Human BioSciences GmbH<br>Im Biotechnologiepark, TGZ I<br>D-14943 Luckenwalde<br>Tel. +49(0)3371-681601 |

Exhibit __4__

Page __32__

| | Fax +49(0)3371-681600 |
|---|---|
| 25. | Idenix Pharmaceuticals, Inc., Cambridge, MA, USA, www.idenix.com<br>US Headquarters:<br>Idenix Pharmaceuticals, Inc.<br>60 Hampshire Street<br>Cambridge, MA 02139<br>Tel: 617-995-9800<br>Fax: 617-995-9801<br>Email: idenix@idenix.com |
| 26. | ImmuPharma PLC, London, UK, www.immupharma.com<br>ImmuPharma plc<br>50 Broadway<br>Westminster<br>London SW1H 0RG<br>UK<br>Tel: +44 20 7152 4080<br>Fax: +44 20 7152 4001 |
| 27. | India Globalization Capital, Bethesda, MD, USA, www.indiaglobalcap.com<br>U.S.A. Office:<br>4336 Montgomery Ave.<br>Bethesda, MD 20814<br><br>Office Phone: 1-301-983-0998<br>FAX: 1-240-465-0273<br>EMAIL: info@indiaglobalcap.com<br><br>Mailing address:<br>India Globalization Capital, Inc.<br>P.O. Box 60642<br>Potomac, MD 20859-0642<br>USA |
| 28. | Indocan Capital, Toronto, Canada, and Mumbai, India, www.indocancapital.com<br>**Canada**<br>1117 Queen Street West<br>PO Box 732<br>Toronto, ON<br>M6J 3X7<br><br>**India Office**<br>Office No. 35, 3rd Floor<br>5, Contractor Bldg, Vaju Kotak Marg<br>Ballard Estate, Mumbai – 400 001<br>96191 26656<br>info@indocancapital.com<br><br>Exhibit ___A___<br>Page ___33___ |

| 29. | Inhibitex Inc, Alpharetta, GA, USA, www.inhibitex.com |
| | **Inhibitex, Inc.** |
| | 9005 Westside Parkway |
| | Alpharetta, Georgia 30009 |
| | 678.746.1100 |
| 30. | LinkCore Pharma Corporation, Vancouver, Canada, www.linkcorepharma.com |
| | 605-1749 Robson Street |
| | Vancouver, British Columbia |
| | V6G 1E1 Canada |
| | T  604-488-8880 |
| | F: 604-682-5686 |
| 31. | LUCRUM Industries, Germany, www.lucrum-ag.de |
| | **Lucrum Industries GmbH** |
| | Rotdornstraße 7 |
| | 40667 Meerbusch |
| | HRB: 9907 |
| | Amtsgericht Neuss |
| | Telefon: +49 (0) 21 32 – 97 18 3-4 |
| | Telefax: +49 (0) 21 32 – 97 18 3-5 |
| | eMail: info@lucrum-ag.de |
| | Internet: www.lucrum-ag.de |
| 32. | Medivir AB, Stockholm, Sweden, www.medivir.se |
| | Medivir AB |
| | PO Box 1086 |
| | SE-141 22 Huddinge, Sweden |
| | Visit: Lunastigen 7, Huddinge |
| | Phone +46 8 5468 3100 |
| | Fax +46 8 5468 3199 |
| | E-mail: info@medivir.se |
| | For more information about Medivir, please contact: |
| | Rein Piir, CFO and VP Investor Relations |
| | Phone +46 8 5468 3123 |
| | E-mail: rein.piir@medivir.se |
| | Paul Wallace, VP Business Development |
| | Phone +44 1799 532 106 |
| | E-mail: paul.wallace@medivir.com |
| | Johan Inborr, Director of Business Development, Lipsovir® partnering |
| | Phone: +46 8 5468 3189 |
| | Mobile: +46 708 853 893 |
| | E-mail: johan.inborr@medivir.se |
| 33. | Merck Research Labs, Rahway, NJ, USA, www.merckvaccines.com |
| | Merck Vaccine Customer Center at 1-877-VAX-MERCK (1-877-829-6372) |
| 34. | Merck/Serono S/A, Geneva, Switzerland, www.merckserono.net |
| | Merck KGAA Headquarters |
| | Merck KGaA |
| | Frankfurter Str. 250 |

Exhibit _A_
Page _34_

64293 Darmstadt
German
T: +49 6151 72-0
F: +49 6151 72 2000

Merck Serono Headquarters
Merck Serono S.A.
9, chemin des Mines
Case Postage 54
CH-1211 Geneva 20
Switzerland
T:  +41 22 414 3000
F:  +41 22 414 2179

| 35. | Migenix Inc., Vancouver, BC, Canada, www.migenix.com |
| | ***Vancouver Office*** |
| | MIGENIX Inc. |
| | Suite 400 - 1727 West Broadway |
| | Vancouver, BC |
| | V6J 4W6 Canada |
| | |
| | Telephone: (604) 221-9666 |
| | Facsimile: (604) 221-9688 |
| | E-mail: info@migenix.com |
| | **INVESTOR RELATIONS** |
| | Paul Brennan |
| | Telephone: 604-221-9666 |
| | Facsimile:   604-221-9688 |
| | E-mail:       info@migenix.com |
| | |
| | **BUSINESS DEVELOPMENT** |
| | Paul Brennan |
| | Telephone: 604-221-9666 |
| | Facsimile:   604-221-9688 |
| | E-mail:       info@migenix.com |
| | |
| | **BOARD CONTACT** |
| | Doug Johnson |
| | c/o MIGENIX Inc. |
| | 102 - 2389 Health Sciences Mall |
| | Vancouver, BC  V6T 1Z3 |
| | Tel: (604) 221-9666 |
| 36. | Novo Nordisk Inc., Princeton, NJ, USA, www.novonordisk-us.com |
| | Novo Nordisk Inc. |
| | 100 College Road West |
| | Princeton, NJ 08540 |
| | (609) 987-5800 |

| 37. | Otsuka Pharmaceutical Company Ltd., Tokyo, Japan, www.otsuka.com<br>**Head Office**<br>2-9 Kanda-Tsukasamachi, Chiyoda-ku, Tokyo 101-0048<br>**Tokyo Headquarters**<br>Shinagawa Grand Central Tower<br>2-16-4 Konan, Minato-ku, Tokyo 108-8241<br>TEL: +81 (0)3-6717-1410 (switchboard) |
|---|---|
| 38. | Pfizer Inc., New York, USA, www.pfizer.com<br>235 East 42nd Street<br>NY, NY 10017<br>Phone: 1-212-733-2323 |
| 39. | Phenomix Corporation, San Diego, CA, USA, www.phenomixcorp.com<br>**Phenomix Corporation**<br>Phone: +1.858.731.5200<br>Fax: +1.858.731.5225<br>info@phenomix.com<br>5930 Cornerstone Court West, Suite 230<br>San Diego, CA 92121<br>**Media & Investor Relations**<br>Pam Lord<br>Porter Novelli Life Sciences<br>Phone: 619-849-6003<br>plord@pnlifesciences.com |
| 40. | Prolor Biotech, Inc. (formerly Modigene Inc.), Nes Ziona, Israel, www.prolor-biotech.com<br><br>3 Sapir Street<br>Weizmann Science Park<br>Nes Ziona<br>P.O. Box 4101<br>Israel 74140<br>Phone: 866-644-7811<br>Fax: +(972)-8-9300091<br>Email: info@modigeneinc.com |
| 41. | Quantum Pharmaceuticals, Moscow, Russia, q-pharm.com<br>Contacts: office@q-pharm.com |
| 42. | Rising Sun Holdings Inc., New York, USA, www.rshinc.com<br>NO INFORMATION ON THE WEBSITE.  NEED LOGIN |
| 43. | Rusnano (Russian Corporation of Nanotechnologies), Moscow, Russia,<br>www.nanowerk.com<br>US Office<br>Nanowerk LLC<br>700 Bishop Street, 17th Floor, Suite 1700<br>Honolulu, HI 96813 |

Exhibit _A_

Page _36_

| | |
|---|---|
| | Europe Office<br>Nanowerk Europe<br>Markgrafenstr. 56, Suite 142<br>D-10117 Berlin<br>GERMANY |
| 44. | Safeguard Scientifics, Inc., Wayne, PA, USA, www.safeguard.com<br>435 Devon Park Drive<br>Building 800<br>Wayne, PA 19087<br>Telephone: 610-293-0600<br>Fax: 610-293-0601<br>Investor Relations: IR@safeguard.com |
| 45. | Sandoz/Novartis Sandoz International GmbH, Holzkirchen, Germany, www.sandoz.de<br>Sandoz Pharmaceuticals GmbH<br>Raiffeisenstr. 11<br>83607 Holzkirchen<br>Telefon: +49(0) 8024 9024 0<br>Fax: +49(0) 8024 9024 100<br>E-Mail: info@sandoz.de |
| 46. | Shenyang Sunshine Pharmaceutical Company Ltd. (3SBIO), Shenyang, China,<br>http://bbs.3sbio.com/en/Indexen.aspx<br>China:<br>Bo Tan, CFO<br>3SBio Inc.<br>Tel:+86(24) 2581-1820<br>e-mail: ir@3sbio.com<br>Tom Folinsbee, Director of Investor Relations<br>3SBio Inc.<br>Tel: (HK) (852) 8191-6991<br>e-mail: tfolinsbee@3SBio.com |
| 47. | SibEnzyme Ltd. (Siberian Enzyme, SE), Academtown, Russia, www.sibenzyme.com<br>SibEnzyme US LLC<br>Address:<br>SibEnzyme US LLC, 2 Franclaire Drive, West Roxbury, MA 02132, USA<br>phone: 781-915-7170<br>fax: 617-553-0856<br>E-mail: info@sibenzymeus.com<br>web site: www.sibenzymeus.com<br><br>Address:<br>SibEnzyme Ltd. 2/12, Ak. Timakova Street<br>Novosibirsk-117<br>630117, Russia<br>phone: +7 3833 334991<br>fax: +7 3833 336853<br>E-mail: info@sibenzyme.com<br>SE web site: www.sibenzyme.com |

Exhibit _A_

_37_

| | |
|---|---|
| 48. | Sixpoint Partners, LLP, New York, USA, www.sixpointpartners.com<br>Sixpoint Partners<br>909 Third Avenue<br>15th Floor<br>New York, NY 10022<br>Telephone (212) 751-8690<br>Fax (212) 751-0197<br>E-mail us at: info@sixpointpartners.com |
| 49. | Teva Pharmaceutical Industries Ltd., Petach Tikva, Israel, www.tevapharm.com<br>Corporate Headquarters<br>5 Basel St. Petach Tikva 49131, Israel<br>☎Tel: +972-3-9267267<br>🖷Fax: +972-3-9234050<br><br>Investor Relations<br>Request for Investor's Information<br>☎Tel: +972-3-9148292<br>☎Tel: (215) 591-8912 |
| 50. | The Channel Group, LLC, New York, USA, www.thechannelgroup.com<br>The Channel Group, LLC<br>1133 Broadway, Suite 706<br>New York, NY 10010<br>USA<br>Tel: (212) 330-8076<br>Fax: (212) 627-8877<br>E-mail: info@TheChannelGroup.com<br>Robert J. Beckman<br>RBeckman@TheChannelGroup.com<br>Allan R. Goldberg, Ph.D.<br>AGoldberg@TheChannelGroup.com<br>Philip N. Sussman<br>PSussman@TheChannelGroup.com |
| 51. | Tibotec BVBA, Mechelen, Belgium, www.tibotec.com<br>Tibotec BVBA<br>tel:  +32 15 46 11 00<br>fax: +32 15 46 19 51<br>email: tibbe-info@its.jnj.com<br>Gen De Wittelaan L 11B 3<br>2800 Mechelen<br>Belgium<br><br>Tibotec Pharmaceuticals<br>+ 353 21 4673500<br>+ 353 21 4673520<br>Eastgate Village<br>Eastgate<br>Little Island |

*A*
*38*

| | |
|---|---|
| | Co Cork<br>Ireland<br><br>Tibotec, Inc.<br>+1 609 730 7500<br>+1 609 730 7501<br>1020 Stony Hill Road<br>Suite 300<br>Yardley, PA 19067<br>USA |
| 52. | Triangle Consulting Group Ltd., London, UK, and Moscow, Russia,<br>www.triangleconsulting.ru<br>Triangle Consulting Group<br>30, bld.2, Prospect Mira, 129090 Moscow<br>Phone: +7 (495) 771 69 38<br>Fax: +7 (495) 680 36 79<br>E-mail: info@triangleconsulting.ru<br>Triangle Consulting Group Ltd.<br>Palladium House, 1-4 Argyll Street, London W1F 7LD.<br>E-mail: info@triangleconsulting.ru |
| 53. | Triginta Capital GmbH, Duesseldorf, Germany, www.triginta-capital.com<br>Triginta Capital GmbH<br>Steinstraße 20<br>D-40212 Düsseldorf<br>Telephone: +49 (0) 211 / 8 62 89 -0<br>Telefax: +49 (0) 211 / 8 62 89 -455<br>Email: info@triginta-capital.com<br><br>Triginta Capital GmbH<br>Markgrafenstraße 33<br>D-10117 Berlin<br>Telephone: +49 (0) 30 / 69 20 63 04 -0<br>Telefax: +49 (0) 30 / 69 20 63 04 -9<br>Email: info@triginta-capital.com |
| 54. | ViroChem Pharma, Inc., Laval, QC, Canada, www.virochempharma.com<br>Contact Us<br>Corporate Headquarters<br>130 Waverly Street<br>Cambridge, MA 02139<br>Tel: 617-444-6100<br><br>San Diego Office:<br>11010 Torreyana Road<br>San Diego, CA 92121<br>Tel: 858-404-6600<br>Fax: 858-404-6726 |

| 55. | ZUBER M & A Partners, Germany, www.zuber-m-and-a-partners.com<br>Corporate Headquarters:<br>ZUBER M & A Partners, Inc.<br>502 East John Street<br>Carson City, Nevada 89706, USA<br>CEO Chief Executive Officer: Gunther J. Zuber<br><br>Subsidiary:<br>ZUBER International GmbH<br>Bamberger Street 1<br>D-36039 Fulda / Germany<br>Tel. +49 - 6 61 - 5 17 70<br>Fax: +49 - 6 61 - 5 78 07<br>Email: g.j.zuber@t-online.de<br>Website:zuber-m-and-a-partners.com<br>Managing Director: Gunther J. Zuber<br>g.j.zuber@t-online.de |
|---|---|

February 11, 2010

Thomas J. Stegmann, MD, PhD
**CEO & President**
**Phage Biotechnology Corporation**

*A*
*40*

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered have been placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as **DEBTOR'S MOTION FOR ORDER (1) APPROVING OVERBID PROCEDURES AND BREAK-UP FEE IN CONNECTION WITH PROPOSED SALE OF SUBSTANTIALLY ALL ASSETS OF THE ESTATE, AND (2) SETTING HEARING ON MOTION FOR SALE OF SUBSTANTIALLY ALL ASSETS OF ESTATE; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DR. THOMAS J. STEGMANN IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On February 22, 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:** On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| February 22, 2010 | PJ Marksbury | _Marksbury_ |
|---|---|---|
| Date | Type Name | Signature |

-28-

MAINDOCS-#140202-v4-Phage_(Motion_Seeking_Approval_of_Bid_Procedures).DOC

NEF SERVICE LIST

- Michael D. Breslauer    mbreslauer@swsslaw.com, wyones@swsslaw.com
- Charles Liu    cliu@winthropcouchot.com, pj@winthropcouchot.com
- David A. Ortiz    david.a.ortiz@usdoj.gov, USTP.REGION15@USDOJ.GOV;shannon.m.vencill@usdoj.gov;tiffany.l.carroll@usdoj.gov
- Matthew J. Riopelle    mriopelle@foley.com
- United States Trustee    ustp.region15@usdoj.gov
- Alan Vanderhoff    alan.vanderhoff@vanderhofflaw.com, alanvanderhoff@cox.net
- Victor A. Vilaplana    vavilaplana@foley.com
- Marc J. Winthrop    pj@winthropcouchot.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MAINDOCS-#140202-v4-Phage_(Motion_Seeking_Approval_of_Bid_Procedures).DOC